Leslie R. MAZE, Plaintiff,

v.

CITY OF FOND DU LAC, a municipal corporation, City Center Development Corporation, a joint venture consisting of Community Savings and Loan Association, a Wisconsin savings and loan association, and Wisconsin Cablevision and Radio Co., Inc., a Wisconsin Corporation, Defendants.

No. 85-C-473.

United States District Court,
E.D. Wisconsin.

Sept. 24, 1986.

Alan Marcuvitz, Milwaukee, Wis., for plaintiff.

Edward J. Simarski, Edward A. Dudek, Susan R. Robertson, Milwaukee, Wis., for defendants.

## ORDER

CURRAN, District Judge.

Leslie Maze, the plaintiff in the above-captioned case, is suing the City of Fond du Lac and City Center Development Corporation (a joint venture consisting of Community Savings and Loan Association and Wisconsin Cablevision and Radio Company, Inc.), pursuant to 42 U.S.C. § 1983, for compensatory and punitive damages. The plaintiff alleges that the defendants violated his rights guaranteed by the United States and Wisconsin Constitutions, as well as violating state statutes and precepts of common law. This court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 & 1343 and the doctrine of pendent jurisdiction.

The defendants all answered, then, after the close of all discovery, the City of Fond du Lac filed a motion to dismiss, or, in the alternative, for summary judgment. *See*

Federal Rules of Civil Procedure 12(b)(6) and 56(b). This motion is now fully briefed and ready for decision. Because matters outside the pleadings have been submitted in connection with this motion, the court will treat the motion as one for summary judgment. *See Martin v. Wray,* 473 F.Supp. 1131, 1135 (E.D.Wis.1979).

## I. FACTS

According to the admitted allegations of the Amended Complaint, plaintiff Maze was the owner of real property located at 17 Forest Avenue in the City of Fond du Lac, Wisconsin. The property included a four-story commercial building. In December of 1983 and January of 1984, the defendants planned a development project for the northwest corner of Forest Avenue and Main Street in Fond du Lac. Community and Cablevision wanted the Maze property to be included in the development, so the City agreed to try to acquire the property; to clear the site; and then to sell the vacant land to Community and Cablevision for the value of the vacant land. The City was to seek financing through a Community Development Block Grant, a program offered by the State of Wisconsin, Department of Development, and funded by the federal government. During January the defendants disclosed their intention to undertake the development if the grant was obtained.

On January 18, 1984, the Redevelopment Authority of the City met and discussed the staff recommendation for the 1984–85 Community Development Block Grant program. The program, which included the City's acquisition of the Maze property, clearance of the site, and sale of the vacant property to the developers, was discussed and approved. Then, on January 21, 1984, a special joint meeting was held with the City Council and Redevelopment Authority to discuss the project. At that meeting, City representatives indicated that a major component to be included in the grant would be the acquisition and demolition of the Maze property for future expansion.

On January 25, 1984, the City Council met. At that meeting, a public hearing was held to review and approve the grant application. The Council approved a resolution authorizing submission of the application, and the application was submitted. This application included a letter of intent signed by Community and Cablevision which stated that the City would acquire and raze the Maze property and sell the land to the developers for the value of the vacant site. The application indicated that the budget for this project called for $300,-000 to be used to acquire the Maze property. At no time prior to submission of the application for the grant did any of the defendants contact Maze to seek his approval or permission for their stated intentions to acquire the Maze property.

On February 2, 1984, a foreclosure action was commenced by Home Savings and Loan Association against Maze as the result of his default on his mortgage note and mortgage on the property at issue. A judgment of foreclosure was entered on March 8, 1984. The judgment provided that Maze had a three month period of redemption. *See* Wis.Stat. § 846.103(2) (1983–1984). Meanwhile, the grant which the City had applied for was awarded on April 9, 1984.

Maze claims that the City's plans for his property were widely publicized. He also alleges that during the first half of 1984, he made numerous efforts to sell the property and that the fair market value of the property as of January 27, 1984, was $575,-000. Maze blames the public disclosure of the City's intentions with respect to his property for the fact that he could not find a buyer before the foreclosure or during the redemption period. The property was ultimately sold at a sheriff's sale on June 13, 1984 to Home Savings and Loan Association for $365,443.83. Maze charges that the defendants all knew that his property was in foreclosure proceedings and that, following the award of the grant, they delayed the implementation of the planned development in order to permit the City to acquire the property at a reduced price following the conclusion of the foreclosure action.

It is undisputed that representatives of the City met with representatives of Home Savings and Loan on June 22, 1984, to negotiate a purchase price for the Maze property. On July 10, 1984, Home agreed to sell the Maze property to the City for $320,000 and the City obtained an option to purchase the Maze property for that price. On August 7, 1984, Maze served a Notice of Claim and Claim on the City pursuant to section 893.80 of the Wisconsin Statutes. The claim was denied on September 26, 1984, and notice of disallowance was mailed by the City on September 27, 1984. Finally, on November 14, 1984, Community and Cablevision publicly announced that they had abandoned plans for the development.

## II. MAZE'S CAUSES OF ACTION

As his first cause of action against the City of Fond du Lac, Maze claims that the City's actions directly and substantially interfered with his property rights, impaired the value of the property, and unreasonably denied him the essential use of the property and all interest in the property. Maze says that these actions by the City constitute a taking without compensation and without due process in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution. In his second count, Maze claims that these actions by the City violated his rights under Article I, sections 1 [1] and 13 [2] of the Wisconsin Constitution.

The third claim for relief alleges that all the defendants conspired to deprive Maze of his right to sell or use his property in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution. The fourth claim charges that the defendants interfered with Maze's property rights, including his ability to sell the property, in violation of section 841.01 of the Wisconsin Statutes.[3] In the Fifth Count the defendants are alleged to have conspired to deprive Maze of his property rights without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution; and in the Sixth Count they are said to have acted for the purpose of willfully injuring Maze in the sale of his property in violation of section 134.01 of the Wisconsin Statutes.[4]

The Seventh Claim for Relief states that at the time of the City's actions in publicly announcing its intention to acquire the Maze property, the City knew or had reason to know that Maze was attempting to sell the property to third parties. Thus, Maze concludes that the City's actions were done for the purpose of intentionally and improperly interfering with his prospective contractual relationship with these third parties.

The Eighth Claim for Relief alleges that all the defendants acted maliciously, willfully and in reckless disregard of his civil rights. As a result Maze asks for punitive damages from each. However, he con-

---

1. Wis. Const., Art. I, § 1 provides:
   All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness, to serve these rights, governments are instituted, deriving their just powers from the consent of the governed.

2. Wis. Const., Art. I, § 13 provides:
   The property of no person shall be taken for public use without just compensation therefor.

3. Wis.Stat. § 841.01 (1983–1984) provides:
   **Declaration of Interest.** (1) Any person claiming an interest in real property may maintain an action against any person claiming a conflicting interest, and may demand a declaration of interests.

(2) Subsection (1) does not apply to lessee's interests in leases of one year or less.

4. Wis.Stat. § 134.01 (1983–1984) provides:
   **Injury to business; restraint of will.** Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of wilfully or maliciously injuring another in his reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.

cedes in his brief in response to the summary judgment motion that punitive damages are not available from the City. *See* Brief in Opposition to City of Fond du Lac's Motion for Dismissal or Summary Judgment at 15.

## III. STANDARDS FOR SUMMARY JUDGMENT

The United States Supreme Court recently set forth the following principles to be applied in ruling on a motion for summary judgment:

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citations omitted). *See also Celotex Corporation v. Catrett*, —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 496 (7th Cir.1986).

The Court went on to say that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* 106 S.Ct. at 2511. When a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, or is no more than a scintilla, summary judgment may be granted. The substantive evidentiary standard of proof that would apply at a trial on the merits applies on a motion for summary judgment. *Id.* at 2512. The party having the burden of proof at trial must show that a reasonable jury could proceed to find a verdict in its favor beyond a reasonable doubt, or by clear and convincing evidence, or by a preponderance of the evidence—whichever burden applies to the case. Faced with this evidence, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.*

The Court cautioned that it is not authorizing a trial on affidavits. *Id.* at 2513.

The jury, not the judge, must still make credibility determinations, weigh evidence, and draw legitimate inferences from the facts. Moreover, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.*

In *Anderson v. Liberty Lobby,* a libel action, the Court emphasized that, even where intent or motive is at issue, the nonmovant cannot rest on the pleadings, but must present affirmative evidence, even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery. *Id.* at 2514.

## IV. DISCUSSION AND DECISION

### A. MUNICIPAL LIABILITY

In moving for summary judgment, the City of Fond du Lac argues that the Amended Complaint fails to state a claim under 42 U.S.C. § 1983 upon which relief can be granted because it does not allege that a municipal policy or custom caused the injury. *See Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 693–94, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); *Strauss v. City of Chicago,* 760 F.2d 765, 769 (7th Cir.1985). In response, Maze points out that "municipal liability [under section 1983] may be imposed for a single decision by a municipal policymaker under appropriate circumstances." *Pembaur v. Cincinnati,* —— U.S. ——, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). The Supreme Court has explained that:

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular officer—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable. Authori-

ty to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policy-making authority is a question of state law. However, like other governmental entities, municipalities often spread policymaking authority among various officers and official bodies. As a result, particular officers may have authority to establish binding [City] policy respecting particular matters and to adjust that policy for the [City] in changing circumstances. To hold a municipality liable for actions ordered by such officers exercising their policymaking authority is no more the application of the theory of *respondeat superior* than was holding the municipalities liable for the decisions of the city councils in *Owen* and *Newport.* In each case municipal liability attached to a single decision to take unlawful action made by municipal policymakers. We hold that municipal liability under § 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Id.* at 1299–1300 (citations and footnotes omitted).

While it is true that the Amended Complaint only refers to "public disclosure of the City's intentions to acquire the property and other official actions of the City," Amended Complaint at ¶¶ 17 & 18, and to the City's delaying the implementation of the planned development in order to permit the City to acquire the Maze property at a reduced price, *Id.* at 19, the court is not limited to the allegations of the complaint on a motion for summary judgment. The deposition of Robert Peterson, the Fond du Lac Director of Community Development, can also be considered. *See* Federal Rule of Civil Procedure 56(c). Throughout his deposition Peterson explains how his office, together with the Common Council, had

final decisionmaking authority over the City's urban renewal program, and specifically over the Community Development Block Grant Program. Beginning in 1979, the City of Fond du Lac, pursuant to a written comprehensive plan for downtown development, had applied for and received various block grants. *See* Deposition of Robert Peterson at 11–30. Peterson recounts that in 1982, the states, including Wisconsin, through its Department of Development, took over the administration of the Community Development Block Grant Program from the federal government, which continued to fund the program. *Id.* at 9. In the City of Fond du Lac, the Common Council, Plan Commission, Redevelopment Authority, Area Economic Authority, County Board of Supervisors, Area Association of Commerce, a housing resource board, and the City Housing Authority all were empowered to take official action concerning the block grant applications. *Id.* at 31–38. However, the only entity whose approval was required was the Common Council. *Id.* at 38. The principal recommending body to the Council was the Redevelopment Authority of which Peterson was a staff person. *Id.* at 36–38.

In regard to the particular block grant at issue in this case, Peterson recalls that, sometime in December of 1983, he himself proposed the City Center Project to the Redevelopment Authority after discussing plans with the developers, Cablevision and Community Savings. *Id.* at 47. The original plan did not encompass the Maze property, but later the developers decided that they would need additional space for expansion, so it was added to the proposal. *Id.* at 52. Then, the Redevelopment Authority recommended the project to the Common Council. After holding at least one public hearing, the Council approved the plan and decided to submit an application for the maximum amount available—seven hundred fifty thousand dollars. *Id.* at 40–43. Before the application was mailed to the state agency, Peterson held informal discussions with Maze's son about acquiring the property. *Id.* at 65. The son did not indicate any opposition to the property be-

ing designated as part of the grant application. *Id.* at 65–66. Peterson says that he was sufficiently comfortable with the developers' commitment to the project to include the Maze property in the application which was mailed to the state on January 31, 1984. *Id.* at 67–68.

The City received notice that a seven-hundred-thousand-dollar grant had been awarded in the beginning of April of 1984. *Id.* at 70. On April 10, 1984, the Common Council met to consider purchasing the Maze property. The Council relied on a 1982 appraisal of the property which set the value at $225,000, but Maze presented his own appraisal done in January of 1984 by the same appraiser, setting the value at $575,000. *Id.* at 75. During the meeting Peterson told Maze's son that his asking price ($525,000–$550,000) exceeded the City's budget, so the City would not be interested in acquiring the property. *Id.* at 83.

Sometime after January 1, 1984, Peterson became aware that Home Savings was about to foreclose on the Maze property. *Id.* at 93. Peterson indicates that he knew about the impending foreclosure when he rejected the Maze offer in April. *Id.* at 94. On June 13, 1984, the property was sold to Home Savings at a sheriff's sale.

The next month Peterson learned that Home Savings would sell the property to the City for $320,000. That same month the City signed the contract governing use of the grant funds. *Id.* at 88. This contract included the acquisition of the Maze property as a component. *Id.* at 91. However, in August or September of 1984, the developers decided not to go ahead with the City Center project and the City began to explore alternate uses for the grant funds. *Id.* at 88.

■ In sum, Peterson's testimony shows that he and the other City policymakers, after considering various alternatives, chose to follow a deliberate course of action in regard to whether or how to acquire the Maze property. These same City officials were responsible for establishing final

policy with respect to the block grants. Maze claims that their chosen course of action caused the unconstitutional taking of his property. Thus, the Amended Complaint, together with evidence in the record, shows that the plaintiff has stated a cognizable claim for municipal liability under section 1983. *See Pembauer v. Cincinnati,* — U.S. —, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Accordingly, the court will not grant judgment to the City because Maze has failed to state a claim on which relief can be granted.

## B. TAKING

### 1. Positions of the Parties

Next, the City of Fond du Lac argues that Maze's first cause of action fails to state a claim for an unconstitutional taking under the guidelines set forth by the United States Supreme Court in *Agins v. Tiburon,* 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 2142 n. 9, 65 L.Ed.2d 106 (1980), where the Court said that:

> Appellants also claim that the city's precondemnation activities constitute a taking. *See* nn. 1, 3 and 5, *supra.* The State Supreme Court correctly rejected the contention that the municipality's good-faith planning activities, which did not result in successful prosecution of an eminent domain claim, so burdened the appellants' enjoyment of their property as to constitute a taking. *See also City of Walnut Creek v. Leadership Housing Systems, Inc.,* 73 Cal.App.3d 611, 620–624, 140 Cal.Rptr. 690, 695–697 (1977). Even if the appellants' ability to sell their property was limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their property when the proceedings ended. Mere fluctuations in value during the process of governmental decision-making, absent extraordinary delay, are "incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense." *Danforth v. United States,* 308 U.S. 271, 285 [60 S.Ct. 231, 236, 84 L.Ed. 240] (1939). *See Thomas W. Garland, Inc. v. City of St. Louis,*

596 F.2d 784, 787 (CA8), *cert. denied,* 444 U.S. 899 [100 S.Ct. 208, 62 L.Ed.2d 135] (1979); *Reservation Eleven Associates v. District of Columbia,* 136 U.S.App.D.C. 311, 315–316, 420 F.2d 153, 157–158 (1969); *Virgin Islands v. 50.05 Acres of Land,* 185 F.Supp. 495, 498 (V.I.1960); 2 J. Sackman & P. Rohan, Nichols' Law of Eminent Domain § 6.13[3] (3d ed.1979).

The City points out that it never threatened condemnation nor attempted to use its powers of eminent domain to acquire the Maze property. When a price could not voluntarily be agreed upon, the City advised L. Robert Maze, the plaintiff's son, that it did not intend to pursue acquisition of his father's property. In addition, only eleven months went by from the time that the City Center project was first made public until the time that the developers publicly announced that their plans for the development had been abandoned. The City contends that Maze could have undertaken inverse condemnation proceedings pursuant to section 32.10 of the Wisconsin Statutes, *see Williamson County Regional Planning v. Hamilton Bank,* — U.S. —, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985), even though the City did not physically occupy the property. *See Howell Plaza, Inc. v. State Highway Commission,* 66 Wis.2d 720, 226 N.W.2d 185 (1975).

In response, the plaintiff shows that on April 2, 1984, he received one offer to purchase his property for $575,000. *See* Affidavit of David A. Roth at Exhibit 26. Maze's son says that the offer was contingent on the City's not proceeding with the acquisition of the property. *See* Deposition of L. Robert Maze at 40–41. However, the offer to purchase entered into by Wayne H. Rose Enterprises does not set forth such a contingency. *See* Affidavit of David A. Roth at Exhibit 26. This explanation for the decision not to purchase is merely mentioned in a letter from Wayne H. Rose dated June 6, 1984. *See Id.* at Exhibit 22.

The plaintiff also contends that there is a material factual dispute as to whether Cablevision, or Community Savings and Loan, or the Fond du Lac City Council, or the

Wisconsin Department of Development were ever notified by Robert Peterson (the Fond du Lac Director of Community Development) that plans had been abandoned to acquire the Maze property. The plaintiff implies that plans were never actually abandoned as evidenced by the fact that on July 26, 1984, the City signed a contract with the Department that bound the City to use the grant funds to acquire the Maze property which, by then, was no longer owned by Maze.

The plaintiff points out that Peterson knew prior to his refusal to accept the Maze offer to sell on April 10, 1984, that a foreclosure action had been commenced. *See* Deposition of Robert Peterson at 92–94. Maze says that Peterson waited until after the sheriff's sale, then negotiated with Home Savings and Loan to acquire the property for $320,000. As a result of these actions on the part of the city, Maze believes that:

> Plaintiff was unable to sell or redeem his property between March 8, 1984, the date the judgment of foreclosure was entered, and June 13, 1984, the date of the sheriff's sale to Home Savings and Loan. The investors who had been interested in purchasing the property informed plaintiff that they could not proceed because of the threat that City would proceed to acquire the property.
> . . . .
> From the facts in the record, a jury could find that City purposely delayed acquisition of plaintiff's property in order to purchase it at a much lower price from Home Savings and Loan. The jury could conclude that City never intended to abandon its plan to acquire plaintiff's property, but rather concluded that no investor would purchase the property from plaintiff in the environment of City's announced intent to acquire the property. The jury could conclude that City effectively froze the plaintiff out of the value that he could have received if he had been able to sell the property, or redeem the property for sale at a later date.

Brief in Opposition to City of Fond du Lac's Motion for Dismissal or Summary Judgment at 9–10.

The plaintiff takes the position that the City abused its power and unconstitutionally deprived him of all or most of his interest in his property. *See Richmond Elks Hall Association v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir.1977). Moreover, according to Maze, the City's contention that he could resort to inverse condemnation proceedings is without merit, because he no longer owns the property.

2. Decisional Law

The substantive law governing the issue of whether Leslie Maze was deprived of rights protected by the Fifth and Fourteenth Amendments to the United States Constitution derives from the Takings Clause of the Fifth Amendment which states "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. As the Court of Appeals for the Seventh Circuit recently explained:

> The Takings Clause does not apply directly to the states, *see Barron v. Baltimore*, 32 U.S. (7 Pet.) 243 [8 L.Ed. 672] (1833), but the Supreme Court has used the Due Process Clause of the fourteenth amendment to supply a similar set of rules, *see Chicago, Burlington & Quincy R.R. v. Chicago*, 166 U.S. 226, 233–41 [17 S.Ct. 581, 583–86, 41 L.Ed. 979] (1897); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 [43 S.Ct. 158, 67 L.Ed. 322] (1922). The Due Process Clause forbids the state to "deprive" a person of "property" save with certain process.

*In re Chicago, Milwaukee, St. Paul and Pacific Railroad Company*, 799 F.2d 317, 326 (7th Cir.1986).

In *Penn Central Transportation Company v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Supreme Court surveyed some of the general principles governing the Takings Clause. The Court then noted that no "set formula" exists to determine, in all cases, whether

compensation is constitutionally due for a governmental restriction on property. Whether public action works a taking is ordinarily an ad hoc inquiry in which several factors are particularly significant—the economic impact of the activity, the extent to which it interferes with investment-backed expectations, and the character of the governmental action. *Id.* at 124, 98 S.Ct. at 2659. When faced with a constitutional challenge to a permanent physical occupation of real property, the Court has invariably found a taking. *Loretto v. Teleprompter Manhattan CATV Corporation,* 458 U.S. 419, 427, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982). These per se cases are to be distinguished from those in which there is only a temporary physical invasion. *See, e.g., PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). Activities other than actual condemnation and physical intrusion can also constitute constructive takings. Such takings occur by government regulation through zoning ordinances and other land-use restrictions. While the mere decline in property values does not, alone, constitute a taking requiring compensation, *Danforth v. United States,* 308 U.S. 271, 285, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939), governmental action short of acquisition may constitute a constructive taking "if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter." *United States v. General Motors Corporation,* 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945).

In this case there was no physical occupation of the Maze property. If a taking did occur, it had to be a constructive taking pursuant to some action by the City. No zoning regulation or ordinance is at issue here either. Peterson's testimony shows that all actions taken by the City in relation to the Maze property were taken pursuant to procedures for seeking and using block grants which had been followed by the City since 1979. Because the grants all involved different properties, different considerations governed the actions taken in regard to each application.

Maze is contending that the fact that the City applied for a grant which included his property as a component and publicized the planned development—all in January of 1984—caused potential investors to lose interest in purchasing the property. *See* Amended Complaint at ¶ 17. In his deposition Robert L. Maze, the son of the plaintiff, testifies that after his family bought the property back from the City in 1983, he made numerous attempts to find a renter or buyer. *See* Deposition of L. Robert Maze at 26. He admits, however, that he did not hire a realtor, retain a rental agency, or advertise in the newspaper. *Id.* at 27. He says that he relied on personal contacts to accomplish his objectives. *Id.* He claims that in the latter part of 1983 he spoke with the A.C. Neilsen Company, Upjohn Health Care, Wayne H. Rose Enterprises, Community Savings, a Larry Bornemann, and attorney Edward Cameron about the possibility of renting or selling the property. *Id.* at 23. Meanwhile, beginning with the time his family reacquired the property, no mortgage payments were made to Home Savings. *Id.* at 28. Robert Maze claims that he had an oral, informal arrangement with Home to defer payments. *Id.*

Although Maze blames City-generated publicity on his liability to find a willing buyer, the one offer to purchase which he has offered into evidence was signed on April 5, 1984,[5] months after the City had publicized its plans. The buyer, Wayne H. Rose Enterprises, offered to purchase the property for $550,000.00 contingent upon securing financing and upon successful inspection. *See* Affidavit of David A. Roth at Exhibit 26. This offer was made after the judgment of foreclosure had been entered on the property on March 8, 1984. The closing date was stated as June 15, 1984, which was after the three-month period of redemption was to expire. Maze

**5.** Although the document offered by Maze is clearly dated April 5, 1984, Maze claims that this is a typographical error and that the actual date was April 2, 1984. *See* Deposition of L. Robert Maze at 39.

attributes this circumstance to a confusion over dates. *See* Deposition of L. Robert Maze at 56. Wayne Rose's subsequent letter of rejection is dated June 6, 1984. In that letter Rose explains that:

My investors were confused upon receiving the news that the city of Fond du Lac has made it publicly known that the city has plans for development for your property. And, in that case, why isn't the city dealing with you on this issue? If we were to invest in your property for the disclosed price of $550,000.00, we would have to have assurance that we could complete our future plans without interruption from the city of Fond du Lac. If we were to purchase said property, and the city of Fond du Lac was determined to develope [sic] your property on its behalf, the city has the right to condemn that property, and we may never recover our investment, plus eliminating the reasons why we acquired the property in the first place.

*Id.* at Exhibit 22.

Although the City's plans were public knowledge at the time Rose executed the offer to purchase and although the City's plans were not listed as a contingency of sale, Maze apparently accepted this explanation for the repudiation of the offer. He claims that the $10,000 earnest money, which was given in the form of a promissory note, was actually paid. *See* Deposition of L. Robert Maze at 39.

The only other documentary evidence of any buyer interest in the property which Maze has produced is a letter from attorney Edward Cameron, dated June 22, 1984, in which Cameron states that his investors had lost interest in the acquisition at the $555,000 price because they feared condemnation by the City. By that time the property had already been sold at a sheriff's sale on June 13.

■ Although usually a court may not judge the credibility of evidence when deciding a motion for summary judgment, evidence may be disregarded if it is totally incredible. *See Donovan v. Metropolitan District Council of Carpenters*, 620

F.Supp. 131, 133 (E.D.Pa.1985), *aff'd in part rev'd in part on other grounds*, 797 F.2d 140 (3d Cir.1986). The court believes that the documentary evidence offered by the plaintiff provides no support for his theory that the public disclosure of the City's plans discouraged potential investors. The Rose offer was not made until over two months after the disclosure, and the Cameron letter of refusal was not received until two months after the City had actually received the grant approval. Based on this evidence, no reasonable jury could find by a preponderance of the evidence that the publicity engendered by the City was the cause of Maze's being unable to find a willing buyer.

Maze next alleges that, due to the City's actions, he was unable to redeem his property pursuant to the March 8, 1984, judgment of foreclosure and that, following the award of the grant, the defendants delayed the implementation of the proposed development in order to permit the City to acquire the property at a reduced price after the redemption period. *See* Amended Complaint at ¶¶ 18 & 19. Again, Maze offers the letters from Rose and Cameron in support of his contention that the marketability of his property had been destroyed.

The record establishes the material facts relevant to these allegations. It is undisputed that the City did not invoke its power of eminent domain or commence condemnation proceedings after being awarded the grant in April of 1984. It is also undisputed that Maze himself did not commence inverse condemnation proceedings at any time while he was the owner of the property. The plaintiff admits that he made no mortgage payments on the property after he reacquired it from the City in 1983, and there is no evidence or allegation that the defendants caused Maze to be unable to make his payments or caused Home Savings to commence foreclosure proceedings in February of 1984.

Governmental action constitutes a constructive taking only "if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter."

*United States v. General Motors Corporation,* 323 U.S. at 378, 65 S.Ct. at 359. Maze claims that the defendants' action extinguished a fundamental attribute of his ownership of the property—his right to sell it to a willing buyer at the market price. Despite the disagreement about the fair market value,[6] it does not appear that Maze is claiming that his property suffered a mere fluctuation in value—he is contending that he was unable to sell it at all. However, under similar circumstances, courts have not found an unconstitutional taking where the government's planning activities encompassed only a short period of time and included no physical invasion, threat of condemnation, or demonstrable reduction of services or use. *See, e.g., Agins v. Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Allen Family Corporation v. Kansas City, Mo.,* 525 F.Supp. 38 (W.D.Mass.1981); *NBH Land Company v. United States,* 217 Ct.Cl. 41, 576 F.2d 317 (1978).

Cases in which courts did find an unconstitutional de facto taking involved situations in which there were numerous aggravated circumstances extending over a significant period of time. *See, e.g., Amen v. City of Dearborn,* 718 F.2d 789 (6th Cir. 1983), *cert. denied,* 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984); *Thomas W. Garland, Inc. v. City of St. Louis,* 596 F.2d 784 (8th Cir.), *cert. denied,* 444 U.S. 899, 100 S.Ct. 208, 62 L.Ed.2d 135 (1979); *Richmond Elks Hall Association v. Richmond Redevelopment Agency,* 561 F.2d 1327, 1330 (9th Cir.1977); *Archer Gardens Ltd. v. Brooklyn Center Development Corporation,* 468 F.Supp. 609 (S.D.N.Y. 1979). In *Amen v. City of Dearborn,* for example, the court found an unconstitutional taking where the city engaged in a deliberate course of conduct to force the sale of private property at reduced value. The city's wrongful activities included: denying the issuance of building permits, repair permits and occupancy permits; attempting to fix the maximum price for homes in the area; requiring property owners to perform maintenance and install items not required by the building code; disseminating wide-spread publicity regarding the city's plans for clearing the area; posting signs encouraging people to sell to the city; and allowing property it had acquired to remain vacant and unprotected. 718 F.2d at 795. Likewise in *Richmond Elks Hall Association v. Richmond Redevelopment Agency,* a case relied upon by the plaintiff, the city designated an area as blighted and scheduled for redevelopment. As a result, over a period of four years, property owners were unable to secure insurance and improvement loans. 561 F.2d at 1330.

By contrast, in the instant case, the City's activities extended only from January of 1984, to the time the project was abandoned in November that same year. Moreover, the City's activities were not numerous or particularly aggravated. The only complained-of activities are: the inclusion of the Maze property in the block grant application; the resulting publicity; and the City's failure to acquire the property before the sheriff's sale. Maze tries to argue that his situation is unique in that, by the time the allegedly unconstitutional activity ceased and he would have been free to sell his property without interference, he no longer owned the property, so the "taking" was not merely transitory in regard to him.

In the final analysis, however, the record clearly shows that the direct causes of Maze losing title to his property were: the fact that he had made no mortgage payments; the fact that Home Savings foreclosed; and the fact that the property was sold at a sheriff's sale. As noted above, there is no evidence that the defendants caused Maze not to be able to pay his mortgage or that they somehow induced Home Savings to foreclose.

---

**6.** The fair market value of the property is in dispute among the parties. Peterson testified that the same appraiser had set three different values: $225,000 in 1982; $575,000 on January 27, 1984; and $320,000 on July 10, 1982. *See* Deposition of Robert Peterson at 75. None of the parties offers any explanation for this fluctuation.

Based on these circumstances, the court concludes that no reasonable jury could find by a preponderance of the evidence that any acts of the defendants were the proximate cause of Maze's loss of the value of his property. Thus, the court rules that, as a matter of law, there was no unconstitutional taking of the Maze property. Accordingly, summary judgment will be granted in favor of the City on the plaintiff's First Claim for Relief.

Because the court has found no unconstitutional taking under the Fifth or Fourteenth Amendments to the United States Constitution, summary judgment will also be granted on the plaintiff's conspiracy claim which is predicated on this same alleged taking. In addition, because judgment will be entered on the federal counts, the remainder of the claims, which are brought under this court's pendent jurisdiction, will be dismissed. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### ORDER

For the reasons discussed above, the court ORDERS that the City of Fond du Lac's Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted and/or for Summary Judgment (filed August 18, 1986) IS GRANTED. Summary judgment shall be entered in favor of the City on the plaintiff's federal claims found in the First, Third and Fifth Claims for Relief of the Amended Complaint. Summary judgment is also granted in favor of the City on the Eighth Claim for Relief for punitive damages. The pendent state claims found in the Second, Fourth, Sixth and Seventh Claims for Relief ARE DISMISSED without prejudice.

IT IS FURTHER ORDERED that, because the remaining defendants are similarly situated to the moving defendant, judgment shall be entered in favor of City Center Development Corporation, a joint venture consisting of Community Savings and Loan Association and Wisconsin Cablevision and Radio Company, Inc., on the plaintiff's Third Claim for Relief. The re-

maining claims against these nonmoving defendants ARE DISMISSED without prejudice.

IT IS FURTHER ORDERED that this action IS DISMISSED.