# DANFORTH *v.* UNITED STATES.

No. 309.   Argued November 8, 1939.—Decided December 4, 1939.

*Mr. J. L. London* for petitioner.

*Mr. Warner W. Gardner,* with whom *Solicitor General Jackson, Assistant Attorney General Littell,* and *Mr. Jacob N. Wasserman* were on the brief, for the United States.

276

MR. JUSTICE REED delivered the opinion of the Court.

A writ of certiorari was granted[1] to review the judgment of the Court of Appeals for the Eighth Circuit[2] affirming a judgment of the District Court for the Eastern District of Missouri which awarded to a property owner, against the United States, compensation in condemnation less in amount than a sum fixed by an arrangement between the parties prior to the institution of the condemnation. This judgment provided for payment of the award into the registry of the court and that upon such payment the United States should be entitled to the relief sought. Although the issue was raised by the landowner, no pro-

---
[1] *Post*, p. 538.
[2] 102 F. 2d 5, 105 F. 2d 318.

vision was made as to interest. The writ was granted to determine important questions of federal law as to the effect in condemnation, of prior agreements by the United States as to the amount of awards and as to the running of interest.

This proceeding arose in the course of carrying out the protection from destructive floods of the alluvial valley of the Mississippi between Cape Girardeau, Missouri, and Head of Passes, Louisiana. This work of internal improvement was begun under the Flood Control Act of May 15, 1928.[3] The passage of this Act followed the disastrous experience with the flood of 1927 and was based upon a comprehensive report and plan known as the Jadwin Plan, Major General Edgar Jadwin, then Chief of Engineers of the United States Army, being in charge of its development.[4] The plan covers the great alluvial valley of the Mississippi through its entire length from the Ohio to the delta. In essence, the plan in its entirety is based upon a levee system which constricts the water to a moderate degree and allows in periods of extreme floods the escape from some lower levees, known as fuse-plugs, of the water from the main channel to back waters and floodways.

The particular portion of the plan involved here is known as the Birds Point-New Madrid Floodway. Prior to the passage of the Flood Control Act, there were levees along the west bank of the Mississippi between Birds Point, Missouri, and New Madrid, Missouri, which substantially followed the meanderings of the river. To get a greater area for the spreading of flood waters, the plan

---

[3] 45 Stat. 534, 33 U. S. C. § 702a–702m.

[4] The plan is found in "Flood Control in the Mississippi Valley," H. R. Doc. No. 90, 70th Cong., 1st Sess. Reference is also made in the Flood Control Act to a plan recommended by the Mississippi River Commission and authority is granted to adjust the engineering differences between the two plans.

provided for a second levee to be set back about five miles
from the riverbank levee running from Birds Point to St.
Johns Bayou, just east of New Madrid. Near its up-
stream connection with the set-back levee the present
riverbank levee would be lowered some five feet by what
is called a fuse-plug, so that at high flood the water will
begin to flow into the wide floodway below. It is ex-
pected that this enlarged channel will keep anticipated
floods from rising above the levees protecting Cairo, Illi-
nois. The set-back levee will confine its diverted water
to the floodway area between the set-back levee and the
riverside levee and will return the water to the Mississippi
through a lower fuse-plug section where a gap is left in
the levee system to permit complete drainage. The land
involved in this condemnation is situated in this floodway
immediately east of the set-back levee and about midway
between Birds Point and New Madrid.

The Flood Control Act stipulates that the United States
"shall provide flowage rights for additional destructive
flood waters that will pass by reason of diversions from
the main channel of the Mississippi River." The same
section authorizes the Secretary of War to "cause pro-
ceedings to be instituted for the acquirement by con-
demnation of any lands, easements, or rights of way
which . . . are needed in carrying out this project. . . ."
Jurisdiction of the proceeding is given to the United
States district court for the district in which the property
is located. Commissioners were authorized to view and
value. It was further provided: "When the owner of
any land, easement, or right of way shall fix a price for
the same which, in the opinion of the Secretary of War is
reasonable, he may purchase the same at such
price . . ." [5]

There is the additional provision in § 1 of this same
Act that "pending completion of any floodway, spillway,

[5] 45 Stat. 534, c. 569, § 4.

or diversion channel, the areas within the same shall be given the same degree of protection as is afforded by levees on the west side of the river contiguous to the levee at the head of said floodway."

Construction work began on the set-back levee on October 21, 1929, and was substantially complete on October 31, 1932. The riverside levee is maintained at its original height of about 58 feet and the upper fuse-plug, which is designed to admit water into the floodway, has not yet been created.

In January, 1937, the Mississippi River attained its highest flood stage in recorded history. Late in that month the United States Army officer in charge of Memphis Engineers, District No. 1, directed a subordinate to proceed to the area and place the Birds Point-New Madrid Floodway in operation. These instructions were issued by the officer in charge of the district without orders from any superior. The directions were carried out after flood waters were trickling over the riverside levee into the floodway area through a natural crevasse and when pursuant to these orders an artificial crevasse was created by dynamiting the northern portion of the upper fuse-plug section. Later another artificial crevasse was created and other natural crevasses developed. Through these crevasses petitioner's land was flooded. As the river would have reached a stage sufficiently high to overtop the riverside levee, even with extraordinary high-water maintenance, the land of the petitioner would have been flooded without the crevassing. The set-back levee did confine the diverted water to the floodway. It increased its depth and destructiveness on petitioner's land. After the flood subsided, the riverside levee, including the upper fuse-plug section, was restored to its previous height.

Prior to the institution of this action, orders had been issued by the Secretary of War, under the provisions of

§ 4 of the Flood Control Act, to purchase this tract of land. A letter containing the offer for the flowage rights here involved, dated January 14, 1932, had been received by the petitioner and the offer accepted by him within an agreed extension of the limited time. The letter, so far as pertinent, reads as follows:

"2. I am accordingly directed by the Chief of Engineers, U. S. Army, to offer you Thirty-one thousand six hundred eighty-one and 98/100—Dollars ($31,681.98) for a perpetual flowage easement as contemplated by the Act of May 15, 1928, over your land designated as Tract No. 243, as indicated on the inclosed plat, this being the maximum amount that can be offered you under the above authorization.

"3. Should this offer be accepted, friendly condemnation proceedings will be entered in Court, with the request that an agreed verdict be awarded in the amount of this offer. Payment cannot be made without Court action as title cannot be cleared. Acceptance of this offer should expedite final settlement and reduce legal expenses."

After its acceptance, there was an attempted withdrawal of this offer by a letter of July 8, 1932, which advised the owner that "after a careful review of the question of flowage over these tracts it was found by higher authority that the prices first suggested could not be properly recommended to the Court."

After this letter, a petition was filed by the United States to condemn over the land here in question a perpetual right, power easement, and privilege to overflow, as contemplated by said project and described in House Document 90. After the appointment and report of the commissioners for the determination of an award, petitioner filed an answer and counterclaim. In the answer he set up that prior to the filing of the suit a "written offer of settlement for the damages and for the purchase

of an easement" for floodway purposes was made by the United States and accepted by petitioner. Petitioner further alleged an offer of title to the easement sought and a request for the payment of the agreed sum. Judgment against the United States was asked in that amount, "with interest," to be paid into court for the benefit of the defendants, in accordance with their respective rights and against the defendants for the perpetual flowage easements "upon payment into Court" of the agreed sum. Changing the designation of the pleading from answer to counterclaim, these allegations were repeated as a counterclaim. The Court sustained a motion of the United States to strike this answer and counterclaim on the ground that the petitioner had waived his rights under the written agreement because of his failure to plead them prior to the entry of the interlocutory order allowing the condemnation and appointing commissioners. Subsequently the reports of the first and second commissions appointed to view the property were set aside for reasons which are immaterial here. To the report of the third commission, awarding $17,921.70, the petitioner renewed the objection that the agreement between the United States and him was decisive in fixing the award at $31,681.98; asked for interest "from such time as the Court may find that plaintiff [the United States] appropriated the flowage easement in question" and sought new viewers to determine the award as claimed by petitioners or in the alternative that the Court enter judgment for the sum claimed with appropriate terms to create the flowage easement in the United States.

Upon this exception a hearing was had and findings and judgment entered confirming this report and adjudging the condemnor the easement sought upon payment of the award. Nothing appeared in the order as to interest. By assignments of error on appeal to the Court of Appeals and in the statement of questions involved

and reasons for granting the writ of certiorari, petitioner has preserved the issues of his right to an award in the agreed amount and to interest from the date found to mark the taking from him of the land.

*Determination of Value.*—By answer and exception to the report of the commissioners, the petitioner pleaded the agreement on the value of the easement evidenced by the letter and acceptance referred to above. The Government contends that the "relevance of the contract . . . as a measure of the value of the easement is not in issue; the petitioner pitches his case solely on the proposition that he can enforce the contract." With this contention we do not agree. In the answer, it is true, judgment is prayed against the United States for the agreed amount. But a judgment is offered to the United States for the perpetual flowage easement upon payment of the sum into court. In the objection to the commissioners' report the prayer is for entry of a judgment in the agreed sum "and upon payment of the same that the Court decree an appropriate judgment in favor of plaintiff for the said easement." We construe the accepted offer as an agreement to fix the price at the named figure for the easement sought. Paragraph 3 of the letter shows condemnation was in mind.

This action is brought under the provisions of § 4 of the Flood Control Act. The jurisdiction of the Court to consider the landowner's contention depends upon the language of that Act, not upon the Tucker Act[6] or the general statute on condemnation.[7] We have no doubt that the authority to purchase given to the Secretary of War is sufficiently broad to authorize a purchase of petitioner's interest in land subject to perfecting the title through condemnation. The effect of such an agreement

---

[6] Judicial Code § 24 (20), 28 U. S. C. § 41 (20).

[7] 25 Stat. 357.

is to fix the value of the easement when the authority of the Court is invoked against a party to the agreement to acquire good title.[8] In dealing with a stipulation to waive a requirement of filing a claim for tax refund with the Commissioner of Internal Revenue, we held such waiver enforceable in the face of a statutory requirement for such filing.[9] The convenience of preparation for trial and the interest of orderly procedure was decisive there. Here the same reasons with the supporting language as to the power of purchase leads to the conclusion that the trial court erred in striking the answer and refusing the motion to determine the value at the agreed price.[10] We need not consider the counterclaim as the answer covers the entire subject of the determination of value.

*Interest.*—Petitioner seeks interest on the judgment from the time of the taking or appropriation of the flowage easement. Petitioner fixes this appropriation at the time of the enactment of the Flood Control Act of May 15, 1928, on the theory that the passage of that Act diminished immediately the value of this property because the plan contemplated the ultimate use of the floodway. Alternatively the date of the taking is fixed by petitioner as of October 21, 1929, when work began on the set-back levee or October 31, 1932, when the set-back levee was completed.

There is no disagreement in principle. Just compensation is value at the time of the taking. The Congress, in other situations, has adopted the time of taking as the

---

[8] Cf. *Wachovia Bank & Trust Co.* v. *United States,* 98 F. 2d 609 (C. C. A. 4th).

[9] *Tucker* v. *Alexander,* 275 U. S. 228.

[10] Cf. *Judson* v. *United States,* 120 F. 637 (C. C. A. 2d) (U. S. District Attorney's agreement to submit matter of damages to arbitration, in condemnation, in accordance with the state statute is binding).

date for determination of value.[11]  For the reason that compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment.[12]  Unless a taking has occurred previously in actuality or by a statutory provision, which fixes the time of taking by an event such as the filing of an action,[13] we are of the view that the taking in a condemnation suit under this statute takes place upon the payment of the money award by the condemnor.  No interest is due upon the award.  Until taking, the condemnor may discontinue or abandon his effort.[14]  The determination of the award is an offer subject to acceptance by the condemnor and thus gives to the user of the sovereign power of eminent domain an opportunity to determine whether the valuations leave the cost of completion within his resources.[15]  Condemnation is a means by which the sovereign may find out what any piece of property will cost.  "The owner is protected by the rule that title does

[11] 46 Stat. 1421; 47 Stat. 722, § 305.

[12] *Kindred* v. *Union Pacific R. Co.*, 225 U. S. 582, 597; in *Roberts* v. *Northern Pacific R. Co.*, 158 U. S. 1, 10, the precedents are collected.

[13] See various statutory means of determining the time of taking in Nichols, The Law of Eminent Domain, 1917, § 436.

[14] See *Bauman* v. *Ross*, 167 U. S. 548, 598, 599, where there was a statutory provision relating to condemnation for streets in the District of Columbia which made the failure of the Congress to appropriate, after six months in session, for the payment of the award of damages an event which terminated the proceedings.  "This provision," this Court said, "secures the owners from being compelled to part with their lands without receiving just compensation, and is within the constitutional authority of the legislature."  "The Constitution does not require the damages to be actually paid at any earlier time; nor is the owner of the land entitled to interest pending the proceedings."

Cf. *Kanakanui* v. *United States*, 244 F. 923 (C. C. A. 9th); *Johnson & Wimsatt* v. *Reichelderfer*, 62 App. D. C. 237; 66 F. 2d 217; *Barnidge* v. *United States*, 101 F. 2d 295, 298 (C. C. A. 8th).

[15] See Lewis, Law of Eminent Domain, 3rd Ed., § 955.

not pass until compensation has been ascertained and paid, . . ." [16] A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.

In *Brown* v. *United States* [17] this Court had occasion to consider whether interest should be allowed on the value of the property from the date of summons, the day fixed by the state statute to determine compensation and damages. In that case condemnation proceeded under the federal conformity statute which directs federal courts to conform to state practice and procedure, "as near as may be." [18] Interest, it was thought, was not governed by the conformity act,[19] but should be allowed in accordance with the state law from the date of summons. This conclusion flowed from the acceptance by this Court, without question, of the day of summons as the date for the determination of value, the day of taking.[20] Here proceedings are under a Flood Control Act prescribing

---

[16] *Hanson Lumber Co.* v. *United States*, 261 U. S. 581, 587.

[17] 263 U. S. 78, 84 *et seq.*

[18] 25 Stat. 357.

[19] 263 U. S. at 87.

[20] 263 U. S. at 85–86: "In these cases, the value found was at the time of taking or vesting of title and the presumption indulged was that the valuation included the practical damage arising from the inability to sell or lease after the blight of the summons to condemn. Where the valuation is as of the date of the summons, however, no such elements can enter into it and the allowance of interest from that time is presumably made to cover injury of this kind to the land owner pending the proceedings." At p. 87: "But the disposition of federal courts should be to adopt the local rule if it is a fair one, and, as already indicated, we are not able to say that with the value fixed as of the date of summons, and the opportunity afforded promptly thereafter to take possession, interest allowed from the date of the summons is not a provision making for just compensation."

jurisdiction and procedure. Where the condemnation is free from statutory direction, as here, there would be no interest before the taking.[21]

This leaves for consideration the contention that there was a taking by the enactment of the legislation, when work began on the set-back levee or when that levee was completed. The mere enactment of legislation which authorizes condemnation of property cannot be a taking. Such legislation may be repealed or modified, or appropriations may fail.[22]

For completion of the set-back levee to amount to a taking, it must result in an appropriation of the property to the uses of the Government.[23] This levee is substantially complete. The Government has condemned the land upon which the set-back is built. The tract now in litigation lies between the set-back and riverbank levees. The Government could become liable for a taking, in whole or in part, even without direct appropriation, by such construction as would put upon this land a burden, actually experienced, of caring for floods greater than it bore prior to the construction. The riverbank levee at the fuse-plug has not been lowered from its previous height. Consequently the land is as well protected from destructive floods as formerly. We cannot conclude that the retention of water from unusual floods for a somewhat longer period or its increase in depth or destructiveness by reason of the set-back levee, has the effect of taking. We agree with the Court of Appeals that this is

---

[21] *Shoemaker* v. *United States,* 147 U. S. 282, 321.

[22] *Willink* v. *United States,* 240 U. S. 572; *Bauman* v. *Ross,* 167 U. S. 548, 596; *United States* v. *Sponenbarger, ante,* p. 256.

[23] Obviously if there was not a taking at the completion of the set-back levee, there could not be a taking by the beginning of construction.

"an incidental consequence" of the building of the set-back levee.[24]  Nor can we conclude that a taking occurred through the act of the Army officers in dynamiting the levee during the emergency of the 1937 flood.  It was restored to its previous height.  Up until this time, the plan for a fuse-plug to permit the escape of destructive flood waters was not in effect.  Indeed, the petitioner disclaims any contention that the crevassing of the levee by the Government was a taking.  The taking, he urges, took place before and this use is only evidence of the control obtained by the prior taking.

*Reversed in part and affirmed in part.*

---

[24] Compare *Bedford* v. *United States,* 192 U. S. 217; *Jackson* v. *United States,* 230 U. S. 1; *Sanguinetti* v. *United States,* 264 U. S. 146.