**WENDY'S INTERNATIONAL, INC., an Ohio corporation, Plaintiff,**

**Jesse T. Todd, in his capacity as Trustee of the Minnie T. Todd Trust, Jesse T. Todd Share Account dated March 1, 1957, et al., Plaintiffs–Intervenors–Appellants,**

v.

**The CITY OF BIRMINGHAM, a municipal corporation, et al., Defendants–Appellees.**

No. 88–7384.

United States Court of Appeals, Eleventh Circuit.

March 24, 1989.

Leitman, Siegal, Payne & Campbell, Eddie Leitman, Andrew P. Campbell, and S. Lynne Stephens, and Corretti & Newsom, Douglas Corretti, and Mary Douglas Hawkins, Birmingham, Ala., for plaintiffs-intervenors-appellants.

Sirote, Permutt, McDermott, Slepian, Friend, Friedman, Held & Apolinsky, P.C., C. Lee Reeves, and Spain, Gillon, Tate, Grooms & Blan, Alton B. Parker, Jr., and

James A. Kee, Jr., Birmingham, Ala., for defendants-appellees.

Before FAY and ANDERSON, Circuit Judges, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

In 1981 the City Council of the city of Birmingham, Alabama, approved a "Master Plan" which called for the redevelopment of the city's downtown area.[1] At that time, the City Council found that the existence and spread of "blighting" factors throughout downtown Birmingham was affecting the health, safety, morals and welfare of the citizens of the city. Since then, the City Council has amended the Master Plan, periodically approving an evolving "Midtown Plan."

On October 20, 1987, the City Council passed Resolution No. 1612–87, endorsing an "amended and restated" Midtown Plan. The updated Midtown Plan authorizes the city to undertake a "Medical Services Project" entailing the construction of a public health clinic. The City Council found that such a facility, intended to both complement and draw upon the resources of the medical center located at the University of Alabama in Birmingham, would benefit the public. The Midtown Plan permits the city to acquire—by condemnation if necessary—the real property on which to build the health clinic. The University of Alabama Health Services Foundation (the "Foundation"), a private, independent professional corporation, desires to develop the clinic contemplated by the Midtown Plan.

The plaintiffs-appellants are landowners and lessees of real property located on the site of the proposed public health facility.

The appellants, who are unwilling to surrender their property to the city for the public good, attended a public hearing held before the City Council and spoke in opposition to the adoption of Resolution No. 1612–87 just prior to its passage. The political process having failed it, Wendy's International, Inc. ("Wendy's") filed suit in the United States District Court for the Northern District of Alabama against the city of Birmingham, its mayor and members of the City Council (collectively, the "City") and the Foundation. Wendy's complaint sought relief from the City and the Foundation in the form of a declaratory judgment that the resolution was unconstitutional because the proposed use of eminent domain to acquire Wendy's property allegedly would advance a private rather than public goal. Wendy's also requested a permanent injunction prohibiting the exercise of eminent domain under the authority of the resolution, as well as damages and attorneys' fees. Shortly thereafter, a number of other entities and individuals filed complaints in intervention seeking relief virtually identical to that requested by Wendy's.[2]

The City and the Foundation filed motions for summary judgment or dismissal for failure to state a claim. By order dated December 1, 1987, the district court elected to treat the motions of the defendants as motions for summary judgment, and on April 15, 1988, the court granted summary judgment in favor of the City and the Foundation. The plaintiffs appeal from that adverse summary judgment.

The backbone of the appellants' position is their allegation that the City, at the Foundation's behest, "lent" its power of eminent domain to the Foundation, a group of doctors which wants the appellants' land for purely private purposes. The appellants view this as a transparent attempt to compel an involuntary transfer of property which now serves as the location of numer-

---

1. The full title of the Master Plan adopted by Resolution No. 530–81 is "Comprehensive Revitalization Strategy, and Redevelopment Plan and Urban Renewal Plan for the Master Plan for Downtown Birmingham, Alabama."

2. Since that time, the original plaintiff, Wendy's, and several intervenors voluntarily withdrew from the litigation, having reached negotiated settlements with the appellees. They are not parties to this appeal.

ous profitable and thriving small businesses into the hands of some 500 physicians poised to reap substantial profits from the operation of a huge outpatient clinic. So, then, say the appellants, the Midtown Plan does not satisfy the fifth amendment's public use requirement[3] and accordingly should be declared unconstitutional. See *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). The appellees attempt to refute this argument by reciting a list of benefits certain to enure to the public as a result of the clinic, public gains which, they contend, will greatly outweigh the anticipated generation of wealth which doubtless will enrich the doctors personally.

Intriguing though the questions raised by these allegations may be, initially we are faced with the crucial issue of whether the plaintiffs have alleged facts sufficient to establish a justiciable controversy. Our concern stems from the undisputed fact that the city of Birmingham has not brought condemnation proceedings against any property of the appellants. This inactivity raises a question sua sponte about whether the dispute has ripened into a case or controversy.

At oral argument, the parties were pressed to address the basis of the district court's subject matter jurisdiction over this lawsuit. Although everyone agrees that there has been no constitutionally cognizable taking of the appellants' property,[4] the litigants urge upon us to decide the merits of this case anyway. They insist that the threat of condemnation is palpable, thus producing an "actual controversy" within the meaning of the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02 (Supp.IV 1986).[5] For the reasons that follow, we disagree. Accordingly, the district court's order granting summary judgment in favor of the defendants must be vacated and the case dismissed for want of federal jurisdiction.

■ At the outset we note that the Declaratory Judgment Act does not enlarge the jurisdiction of the federal courts but rather "is operative only in respect to controversies which are such in the constitutional sense.... Thus the operation of the Declaratory Judgement Act is procedural only." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 463, 81 L.Ed. 617, 621, reh. denied, 300 U.S. 687, 57 S.Ct. 667, 81 L.Ed. 889 (1937). Consequently, a party seeking declaratory relief must satisfy the same jurisdictional requirements prerequisite to the bringing of other suits. *Brown & Root, Inc. v. Big Rock Corp.,* 383 F.2d 662, 665 (5th Cir.1967). Chief among these is the constitutional limitation of the judicial power to cases and controversies. U.S. Const. art. III, § 2, cl. 1.

■ Whether a case or controversy exists must be determined on a case-by-case

---

**3.** The eminent domain clause of the fifth amendment, made applicable to the states through the fourteenth amendment, provides that "private property [shall not] be taken for public use, without just compensation."

**4.** It is settled law in this circuit that "[n]ot every governmental action interfering with a property interest is a taking entitling the owner to compensation. A case in point is the initial legislative determination that property should be taken for public use." *Charles J. Arndt, Inc. v. City of Birmingham,* 748 F.2d 1486, 1491 (11th Cir. 1984) (citing *Danforth v. United States,* 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240 (1939). As the Supreme Court explained in *Danforth,*

A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense.

....

... The mere enactment of legislation which authorizes condemnation of property cannot be a taking. Such legislation may be repealed or modified, or appropriations may fail.

*Id.* at 285, 286, 60 S.Ct. at 236, 237, 84 L.Ed. at 246, 247 (footnote omitted), *quoted in Arndt,* 748 F.2d at 1491.

**5.** Section 2201(a) provides, in pertinent part,

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

basis. *Hendrix v. Poonai,* 662 F.2d 719, 721–22 (11th Cir.1981). This is so because, as the Supreme Court has explained,

> The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Maryland Casualty Co. v. Pacific Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826, 828–29 (1941). Put another way, "[a] controversy, to justiciable, must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop." *Big Rock,* 383 F.2d at 665.

■ To implicate the fifth amendment's eminent domain clause, the government must take private property. In the instant case, the appellants have not alleged facts which, if proved, would demonstrate a taking. Neither have they alleged a manifest threat of condemnation. Indeed, the Midtown Plan obligates the developer of the Medical Services Project to negotiate with landowners in good faith and to offer to each at least the fair market value of his property as determined by an independent appraiser. If after a period of at least eight months the developer has been unable to negotiate purchases of all property needed for the project, the city of Birmingham must begin bargaining. It too must offer at least fair market value for each property, and the Midtown Plan mandates that the city should negotiate for at least four months. Only after the developer has exerted all reasonable efforts to reach a fair settlement and obtain the property by agreement shall the city be obligated to exercise its eminent domain power. Under these circumstances, the threat of condemnation simply is too attenuated to stir up an actual controversy. As it is, absent allegations pointing to a cognizable taking or the palpable threat of such, the appellants' suit necessarily is based upon the possibility of an occurrence which may never come to pass.[6] Thus, there is as yet no controversy here ripe for adjudication.[7] For these rea-

---

6. The fact that many of the property owners once involved in this action have since settled and dropped out of the litigation decisively demonstrates this point.

7. We have not ignored *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). There, the Supreme Court upheld a Hawaii statute which allowed the state to condemn the private property of lessors and transfer it to lessees to reduce the concentration of ownership of fees simple in the state. Landowners faced with the imminent condemnation of their property had sought a declaration that the law was violative of the fifth amendment's public use requirement and an injunction prohibiting enforcement of the statute. That formal condemnation proceedings had not been brought against the lands in question did not deprive the federal courts of jurisdiction. Thus, both sides here, anxious for us to reach the merits, liken the case under consideration to *Midkiff* and reason that if the dispute in the earlier case were ripe for judicial review, then it follows that this controversy is justiciable as well.

As we spelled out above, however, ripeness must be decided on a case-by-case basis. In *Midkiff,* the process through which the landowners' property could be acquired was well under way by the time the landowners brought suit. Although condemnation proceedings had not been commenced, the state had made the statutorily required finding that the acquisition of the lands in question would further the statute's public purposes and had ordered the landowners to submit to compulsory arbitration with their lessees for the purpose of determining the prices at which the properties would be sold. *Id.* at 234, 104 S.Ct. at 2326, 81 L.Ed.2d at 193. Thus, under Hawaii's law, that the landowners eventually would be forced to surrender their property was an inevitability. In contrast, the likelihood here that the property of the plaintiffs will be confiscated has not yet matured into a credible certainty. Unlike the statute at issue in *Midkiff,* the purpose of which was to establish a condemnation scheme, the Midtown Plan merely authorizes the exercise of eminent domain—as a last resort. The plaintiffs here may reach negotiated settlements with the developer, as many of their neighbors already have. Or, the City Council might select another site for the Medical Services Project, or abandon it altogether. *Midkiff,* therefore, is dis-

sons, the district court's summary judgment in favor of defendants is vacated and the case remanded with instructions to dismiss for lack of subject matter jurisdiction.

VACATED AND REMANDED.

tinguishable and does not compel the conclusion that the present controversy is ripe for judicial consideration.