2007 VT 28

# In re Chittenden Solid Waste District

[928 A.2d 1183]

No. 05-217

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed April 20, 2007

Motion for Reargument Denied June 22, 2007.

*Michael L. Burak* and *W. Scott Fewell* of *Burak Anderson & Melloni, PLC*, and *Joseph E. Frank* of *Paul Frank & Collins, P.C.*, Burlington, for Plaintiff-Appellee.

*Robert F. O'Neill, Norman Williams* and *Megan J. Shafritz* of *Gravel and Shea*, Burlington, for Defendant-Appellant.

¶ 1. **Dooley, J.** Hinesburg Sand & Gravel Company, Inc. (HS&G) appeals from an amended judgment of $4 million in damages for the condemnation of its sand pit by Chittenden Solid Waste District (the District) to create a solid waste landfill.

Following a jury verdict, the Chittenden Superior Court granted the District's motion for judgment as a matter of law pursuant to V.R.C.P. 50(b). The court ruled that HS&G suffered no compensable business loss, and it set aside that part of the verdict that awarded HS&G an additional $4.8 million for business loss. HS&G argues that the court erred in granting the motion and that the court should have awarded it interest to make the valuation current. We hold that the superior court properly determined that HS&G was not entitled to compensation for business loss or to prejudgment interest. We affirm.

¶ 2. Condemnation proceedings began in 1992 when the District filed a petition pursuant to 24 V.S.A. § 2299a to condemn a sand pit located in Williston, Vermont that is owned and operated by HS&G. As its name suggests, HS&G's manufacturing and processing plant, as well as its main gravel pit, are located in Hinesburg, some miles from the sand pit.

¶ 3. The District intends to create a regional solid waste landfill at the sand pit site. The landfill condemnation statute, 24 V.S.A. §§ 2299a-2299k, sets forth two separate steps for the District to condemn property for a landfill. First, the District must show, and the superior court must find, that the condemnation is necessary. *Id.* § 2299e. Second, unless the District and any person "with an interest in the property" can agree on damages, the court must assess the damages caused by the taking. *Id.* § 2299f.

¶ 4. In this case, HS&G contested both the necessity for the taking and, after necessity was determined, the compensation offered by the District. In the necessity phase, the superior court found that the District had satisfied the criteria for necessity set forth in 24 V.S.A. § 2299b(1), subject to the condition that the District stockpile and make sand from the pit available to HS&G for up to thirty years. The condition was included pursuant to a plan presented by the District to excavate and stockpile sand, at its expense, for HS&G to transport to its Hinesburg plant to process. To the extent the District excavated and stockpiled sand for HS&G, the plan required it to (1) excavate the sand "in a reasonable way" consistent with "preserving or enhancing the value of the available sand to HS&G," (2) cover it with a "vegetative cover," and (3) handle it so as to "prevent any significant contamination by litter or landfill leachate." HS&G appealed the finding of necessity and the court's authority to order the stockpiling condition to this Court, and we affirmed.

*Chittenden Solid Waste District v. Hinesburg Sand & Gravel Co.*, 169 Vt. 153, 154, 730 A.2d 614, 616 (1999).

¶ 5. In affirming, we explained that the superior court had simply adopted the proposal of the District, and had not modified or altered the proposal. Thus, we stressed that the condition did not bind HS&G:

> The condition objected to by HS&G was imposed on [the District] not HS&G. HS&G could take it or leave it. The condition commits [the District] to adhere to a plan, at [its] cost and expense, to make the Redmond sand available to HS&G . . . if it chose to take it. We conclude that in so determining the court did not bind HS&G to any conditions subsequent to the condemnation, but instead was merely adhering to the legislative mandate under § 2299b(1) that the court consider and give effect to the policy of protecting earth resources as required by 10 V.S.A. § 6086. . . .

> . . . The court did take into account "inconvenience and expense" by offering HS&G the choice whether to accept the sand. Depending on HS&G's choice, the issue of expense may be relevant in the damages portion of the proceedings yet to come.

*Id.* at 160, 730 A.2d at 619-20.

¶ 6. This appeal arises from the damages phase of the condemnation. Before trial, the parties skirmished over what issues could be litigated in the damages phase. The District, through a motion for partial summary judgment, argued that HS&G was precluded by collateral estoppel from relitigating issues related to the viability of the District's plan to excavate and provide sand to HS&G. The superior court agreed, deciding that HS&G could not relitigate the claim that sand would not be available, because that issue had been decided in the necessity phase when the court found that the District's plan would provide sand to HS&G in a useful and valuable form. The court did, however, deny the District's motions in limine to prevent HS&G's experts from testifying to the costs involved in using the excavated sand as it related to business losses. A similar ruling was made just before trial commenced.

¶ 7. During the jury trial on damages, HS&G introduced evidence to prove that in addition to compensation for the value of

the sand pit property, it was entitled to recover for business losses consisting of the additional costs of sorting the commingled coarse and fine sand and cleaning the sand because of contamination by bird droppings on the stockpile. HS&G's expert testified that this additional processing would cost the company over $5.7 million. As to the value of the property itself, appraisal experts for both parties agreed that the highest and best use of the property was as a landfill, and not as a sand pit. They agreed that the property's fair market value, when valued as a landfill, was about $1.8 million.[1] In addition, HS&G president Paul Casey testified that he thought the property was worth $7.5 million, without including the value of the sand.

¶ 8. The court instructed the jury that it could award HS&G compensation for both the fair market value of the property and the business loss. For the property value determination, the court instructed the jury to determine fair market value "based on the highest and best use of the property," defined as the one "which is the most profitable." The court went on to instruct that fair market value "includes the value of the sand." The court also instructed that in determining fair market value it must consider the effect on that value of any restrictions on the District's use: the right of HS&G to excavate and remove sand through October 31, 2007, the obligation of the District to make sand available to HS&G under its sand plan, and the right of HS&G to take the stockpiled sand without charge. The court instructed that the jury should set fair market value as of January 1, 2000. Since the valuation date was already nearly four years old, the court further instructed: "Do not add interest, that will be handled by the Court after the verdict is received."

¶ 9. The court also instructed on business loss as follows:

> Damages to the sand and gravel operation at the Hinesburg plant are measured by any increase in the costs of operating the plant caused by the District's taking of the Redmond Road sand pit. Hinesburg Sand and Gravel asserts that the District's co-mingling of coarse and fine sands and the defecation of sea gulls on

---

[1] The District's expert, George Silver, went on to state that the conditions imposed by the necessity judgment order — that the District must provide sand to HS&G and may not begin construction until 2007 — reduced the fair market value from $1.8 million to $775,000.

the sand piles will increase processing costs back at its plant. . . . [A]ny damages for increased costs at the Hinesburg plant must be reduced to present value as of January . . . of 2004. . . . I must inform you that Hinesburg Sand and Gravel will have sufficient quantity and quality of Redmond sand to continue its plant operations for the foreseeable future. . . . And although there will be sufficient quantity and quality, that does not answer the question of whether there may be increased processing costs which is what a good deal of this trial was about.

¶ 10. The jury returned a verdict of $4 million for the property and $4.8 million for the value of business loss. After the jury rendered its verdict, the District moved for judgment as a matter of law pursuant to V.R.C.P. 50(a), arguing that HS&G failed to carry its burden of proof on business loss damages. In this motion, and in its renewed motion in March 2004, the District argued that HS&G was collaterally estopped from arguing that it would have to bear increased processing costs because the court had found in the necessity phase that the "inconvenience and expense to HS&G [because of the sand plan] would be negligible." The District also argued that the evidence supporting business loss was speculative, that business loss was unrecoverable for business on another property — that is, the site of the Hinesburg plant — and that HS&G could not recover for business loss based on its use of the property as a sand pit when the amount of damages was based on the use of the property as a landfill. The court granted the District's motion for judgment as a matter of law on March 23, 2005, striking the award for business loss. The court agreed that HS&G was collaterally estopped from arguing about the quality and quantity of sand, that the business loss incurred was not to "business on the property" as required by statute, and that valuing the property as a landfill and then obtaining compensation for business loss associated with its use as a sand pit would constitute double recovery. On May 6, 2005, the court entered an amended judgment of $4 million for the fair market value of the property. HS&G here appeals this amended judgment, challenging the deletion of the business loss damages.

¶ 11. After the trial ended, the court considered whether to order prejudgment interest on the jury's award. HS&G asserted that it was entitled to such prejudgment interest, and it left

blanks for the court to enter interest in its proposed judgment order. Despite the court's earlier suggestion in the jury instructions that interest would be added to the January 1, 2000 valuation, the court declined to order prejudgment interest on the property value award. The court reasoned that because the land had not yet been taken, HS&G had not been deprived of the property, so no interest was due. Notably, the court did not address its earlier statements about interest in the jury instructions, focusing instead on the fact that even though the parties knew the taking would not occur until at least 2007, no one objected to the chosen valuation date. HS&G appeals this denial of prejudgment interest.

¶ 12. The District moved for a new trial or remittitur of part of the damages awarded for the property taken pursuant to V.R.C.P. 59(a), arguing that the jury's award of $4 million for the property was excessive and against the weight of the evidence. The District urged the court to remit the award to $1.8 million, the value that both parties' experts had agreed was the fair market value of the property as of January 1, 2000. In the court's March 23, 2005 entry granting the District's motion for judgment as a matter of law on the business loss damages, the court chose to defer ruling on the motion for a new trial or remittitur. The court commented that it would wait to rule on the motion until advised by the District as to whether it wished to proceed with the motion or waive the motion and permit final judgment and appeal. A month later, the District informed the court that it would not object to a denial of its pending motion for a new trial or remittitur to prevent any further delay in entering a final judgment. On May 6, 2005, the court entered the amended judgment and later issued an entry order indicating that the motion for new trial or remittitur had been withdrawn. In response to HS&G's appeal, the District filed a cross-appeal, stating that if this Court did not affirm the superior court's grant of judgment as a matter of law, the case should be remanded for a decision on the merits of its motion for a new trial or remittitur. The District also argues that such a remand should address whether the evidence supporting business loss was speculative, and asserts that, if the case is remanded on the issue of business loss damages, this Court should order a new trial on all damages issues, including the $4 million valuation of the land.

¶ 13. The first issue is whether the superior court erred in denying HS&G business loss damages for processing costs asso-

ciated with cleaning and sorting the stockpiled sand. We review a judgment as a matter of law de novo, using the same standard as the trial court. *Schaad v. Bell Atlantic NYNEX Mobile, Inc.*, 173 Vt. 629, 631, 800 A.2d 455, 458 (2002) (mem.). "Judgment as a matter of law is appropriate" where there is " 'no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party.' " *Id.* (quoting V.R.C.P. 50(a)(1)).

¶ 14. Vermont has a special statute for condemnation by solid waste management districts. 24 V.S.A. §§ 2299a-2299k. On the issue of damages available to the property owner, the statute is identical to that for condemnation generally. Compare *id.* § 2299b(2) with 19 V.S.A. § 501(2). Thus, our preexisting case law on damages available in condemnation proceedings is applicable here. Vermont law specifically authorizes damages for the value of "the business on the property, and the direct and proximate decrease in the value of the remaining property or right in the property and the business on the property." 24 V.S.A. § 2299b(2); 19 V.S.A. § 501(2).

¶ 15. In looking at business loss in this case, we start with an observation from *Pinewood Manor, Inc. v. Vermont Agency of Transportation*, 164 Vt. 312, 317, 668 A.2d 653, 657 (1995):

> Though many states view injury to or destruction of a business upon lands taken by eminent domain as too uncertain, remote and speculative to be compensable . . . Vermont specifically identifies business loss as a reimbursable item of damage in a condemnation proceeding. 19 V.S.A. § 501(2). Business loss is not unlimited, however, and this Court has adopted standards to minimize uncertainty and speculation.

The property owner has the burden to show business loss. *Id.* at 319, 668 A.2d at 658. Especially in cases where the property owner's business involves selling all or part of the land or using the land intensely, we must be particularly careful not to allow double recovery between the amount for the value of the property taken and the value of the business that is on the property taken. Thus, we can allow compensation for business loss only to the extent that such loss has not been compensated in the value of the land taken. See *Penna v. State Highway Bd.*, 122 Vt. 290, 293, 170 A.2d 630, 633 (1961). We observed in *Penna* that, with respect

to farm land compensation, the loss of the business of the farm and the value of the land is almost always double compensation. See *id.*

¶ 16. The general rule that damages for business loss are allowed only to the extent that the landowner has suffered a loss to the business which has not been compensated for in the allowance made for the land is explained in *Sharp v. Transportation Board of State of Vermont*, 141 Vt. 480, 451 A.2d 1074 (1982). In *Sharp*, the State took most of the property owner's land for construction of a highway and, as a result of the condemnation, prevented the continuation of the farm on the property. The jury made an award for the land at its highest and best use, which was agreed to be for residential development. Pursuant to instructions, the jury also awarded the land owner damages for the full value of his lost farm operation. This Court reversed holding that recovery of the land value based on one use and business loss based on another would create double recovery. *Id.* at 488, 451 A.2d at 1077; see also *Mazza v. Agency of Transp.*, 168 Vt. 112, 117, 716 A.2d 817, 821 (1998). Although there are significant differences in the circumstances here compared to those in *Sharp*, there is similar double recovery here because the sand pit land was valued at its highest and best use as a landfill, but the business loss award assumed it continued as a sand pit. This is not, however, the most significant point about the application of *Sharp*.

¶ 17. We explained in *Sharp* how to value business loss. In the simple case where the business is taken entirely, the amount of the business loss is determined by subtracting the value of the land, at its highest and best use, from the value of the business before the taking. 141 Vt. at 487, 451 A.2d at 1077. In the case where, as here, the business is not taken entirely, the business loss is equal to the loss in the value of the business as a result of the taking minus the added value to the land caused by valuing it at its highest and best use. We emphasized in *Sharp* that the business loss is measured in the first instance by the reduction in the value of the business. See *id.* at 489, 451 A.2d at 1078 (if the taking "did not totally destroy [the] business," the damages are the actual "diminution in value of the business remaining"). On reargument in *Sharp*, we explained some of the factors going into business value:

> The value of the business as a whole includes (a) the contribution made by the land to the business, (b) the personal property used by the business, (c) the going concern value of the business, (d) the increased value derived from the fact that tangible assets are combined in a single unit and are already functioning in the marketplace, and (e) where appropriate, goodwill.

*Id.* at 491, 451 A.2d at 1079.

¶ 18. The holding of *Sharp* was further explained in *Pinewood Manor.* There, the property owner was a residential housing developer and the condemned land was subdivided for housing construction based on a subdivision permit. As business loss, the property owner sought the profits it would have made from the houses it planned to construct on the land. We rejected the inclusion of lost profits as a factor in the business loss calculation for two reasons. The first was that "lost profits depend on speculation and conjecture." *Pinewood Manor*, 164 Vt. at 318, 668 A.2d at 657. The second was a concern for "duplicate compensation." *Id.*, at 318, 668 A.2d at 658. We stated:

> Prior profitability already influences the business loss calculation because it affects the value of the business as a going concern and the value of its goodwill. Because Pinewood has already received the fair market value of the lots, the only extra compensation to which it might be entitled would come from these more negligible factors that are included in the valuation of the business as a whole.

*Id.* at 318-19, 668 A.2d at 658.

¶ 19. Finally, we further explained the *Sharp* holding on valuing the business loss in *Mazza*, where the plaintiff argued that its business loss consisted of the cost of a new irrigation line on his remaining farm land. 168 Vt. at 118, 716 A.2d at 821-22. Relying on the holding of *Allen v. Burlington Housing Authority*, 129 Vt. 8, 13, 270 A.2d 588, 592 (1970), that the cost of improvements is not necessarily reflected in value, we held that the cost of the irrigation line was not necessarily reflected in the value of the business. *Id.*

¶ 20. HS&G's proof in this case suffers from the same deficiency as the plaintiffs' did in *Mazza* and *Pinewood Manor.* HS&G's

president testified to the value of the business before the taking and described in detail the effect of the loss of the Redmond Road sand and the additional costs that the District's plan to excavate and stockpile sand would impose on it. Through its officers and expert witness, it presented the expected cost of removing seagull feces from the sand and of segregating the sizes of sand that would become commingled in the transport from the pit to the stockpile. Its theory was that it should be able to recover its additional costs over the remaining life of the sand. Consistent with that theory, the superior court charged the jury that the proper measure of damages was the cost to clean and segregate the sand, and the jury necessarily based its business loss award on those costs.

¶ 21. Just as we refused to measure lost value of the business by lost profit, or the cost of infrastructure made necessary by the land taking, we cannot measure lost value by the additional expense involved in using Redmond Road sand. The District was bound to excavate and stockpile the sand, but HS&G was not obligated to take it if the cost of processing made it uneconomical. We recognize that there was extensive testimony about the unique role of Redmond Road sand in HS&G's business operations. But there was little evidence of how HS&G would operate without such sand and none on the value of HS&G without Redmond Road sand.

¶ 22. More important, there was extensive evidence on how, and to what extent, the District's plan for excavating and stockpiling sand would increase HS&G's processing costs if it chose to use the stockpiled sand, but there was no evidence of how the annual increase in processing costs affected the value of HS&G. Just as we rejected the argument that it would have been impossible in *Mazza* to estimate the impact of the need to relocate the irrigation line on business value, 168 Vt. at 118-19, 716 A.2d at 822, we reject the argument that HS&G could not have shown the impact of the processing costs on the value of the business. Without that showing, the jury could not properly determine business loss, the issue on which HS&G had the burden of proof. Indeed, given the double recovery inherent in the jury's verdict, we cannot determine whether there was any net business loss. We conclude that the superior court was correct in granting the District's motion for judgment as a matter of law on business loss damages.

¶ 23. We recognize that we have decided this issue in part on different grounds than those relied on by the trial court, although the trial court did hold that HS&G's business loss damages included double recovery and the parties briefed in this Court the measure of damages for business loss. In view of our disposition, we do not reach the decision of the superior court that business loss damages were precluded, in part, by the collateral estoppel effect of the necessity determinations or that HS&G's business losses were not "on the property" as required by 24 V.S.A. § 2299b(2).

¶ 24. The second issue is whether HS&G is entitled to prejudgment interest on its jury award. This issue requires an explanation of some background. On November 30, 1999, in order to supplement the judgment order of January 1997 determining that necessity requires the taking of the land, the court issued a "net taking order." Among other items, this set the date of valuation of the real property being taken at January 1, 2000 with the specification that "all calculations of damages should assume that the real property will be taken" on this date. See 24 V.S.A. § 2299f(c) ("The superior court shall determine damages as of the date the property is acquired or at such other date as the court determines."). The order further stated that "[a]ll issues of prejudgment interest will be determined after trial." In a later order on prejudgment interest in 2004, the trial court described the process that led to the choice of the valuation date.

> [After the determination of necessity], counsel met with the undersigned to discuss issues involving the valuation or damages portion of the case. One such issue was the date for valuing the property. In order to assess fair market value, appraisers must know a date for valuation. . . . Here, the date of January 1, 2000 was chosen, admittedly arbitrarily. . . . But although the date itself was not significant, two other facts probably are. First, the parties knew that the District would not actually be entering upon the land at that time, or indeed until late in 2007, due to other outstanding court orders, and indeed Hinesburg would continue to operate the [s]ite itself through 2007. Second, there was no objection to the selection of the valuation date, as there never has been since. As a result, the valuation phase of this

condemnation proceeding was tried with that date as its focal point.

Consistent with the court's statement of the history, the court charged the jury at the compensation trial that they were to value the real property as of January 1, 2000 and they were not to award interest. HS&G did not object to the jury charge.

¶ 25. Following the verdict, HS&G submitted a proposed judgment order that included interest on the jury's verdict for the taking at the statutory rate from January 1, 2000 to the date of the judgment order. The District objected, arguing that prejudgment interest was unavailable before the actual date of taking, which under the agreement of the parties was no earlier than October 1, 2007. The trial court agreed and denied prejudgment interest.

¶ 26. HS&G relies primarily on two cases, *Pinewood Manor* and *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1 (1984), for the proposition that interest is available before the land is taken. The cases actually support the District's position and the superior court decision. *Kirby Forest* holds that prejudgment interest does not begin to accrue until there is an actual taking, which occurs when the government tenders payment and acquires title to the land. 467 U.S. at 16; see also *Danforth v. United States*, 308 U.S. 271, 284 (1939) ("[W]e are of the view that the taking in a condemnation suit . . . takes place upon the payment of the money award by the condemnor."). We held in *Pinewood Manor* that prejudgment interest was available but only because the actual taking had occurred well before the judgment was entered on compensation and the interest ran from the date of the taking. 164 Vt. at 314, 320-21, 668 A.2d at 655, 659.

█ ¶ 27. The District has not tendered payment nor acquired title to HS&G's sand pit.[2] HS&G continues to retain possession and use of the sand pit and its interest in the property has not been impaired in any way. The superior court correctly denied HS&G prejudgment interest.

---

[2] The District could have tendered payment in accordance with its board's determination of the appropriate amount of damages and acquired equitable title and possession while the appeal was pending in the superior court and in this Court. 24 V.S.A. § 2299i. It did not do so in this case. In fact, the parties stipulated that HS&G would retain possession with the right to withdraw sand until October of 2007.

¶ 28. HS&G argues, however, that even if it is not entitled to interest as a matter of law, the District is bound by a concession that HS&G should receive interest on the verdict amount for the taking of the property. In urging the net taking order, the District made the following statement:

> Prejudgment interest on the real property component of the compensation award will begin to run as of that date [January 1, 2000]. However, to avoid a windfall to HS&G — which may arise if the legal interest rate exceeds the inflation rate for real estate — this Court should set an appropriate rate for that interest based on the economic conditions prevailing in the period from January 1, 2000 to the conclusion of the compensation trial.

In its brief, HS&G asserts that the doctrine of judicial estoppel prevents the District from changing its position and that the law of the case prevented the superior court from denying interest. In its reply brief, it calls the District's statement a "stipulation" that is binding and on which HS&G relied in agreeing to the January 1, 2000 valuation date. We can find, however, no indication that these arguments were made to the superior court, and the court had no opportunity to address them. Moreover, the court did not treat the District's statement as a binding concession or stipulation, stating that "[a]ll issues of prejudgment interest will be determined after trial."

¶ 29. Even if we address these arguments, we cannot conclude that they give HS&G a right to interest. We have not affirmatively adopted judicial estoppel. See *Gallipo v. City of Rutland*, 173 Vt. 223, 237, 789 A.2d 942, 953 (2001). In any event, the doctrine is based on the inconsistency between the current position of a party and a prior position of that party, but requires that the prior position be "adopted by the court in some manner." *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 98 (2d Cir. 1997). The court in this case never acted on the District's earlier position. Similarly, there can be no "law of the case" in the absence of a judicial decision establishing that law, reserving the question in the net taking order and again in the jury instructions. See *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 148 (2d Cir. 1999) (law of the case, like res judicata, "limits relitigation of an issue *once it has been decided*." (emphasis added)). Finally, there was no stipulation

or agreement between the parties with respect to HS&G's entitlement to interest.

¶ 30. HS&G makes a new argument here, however, that even if it is not entitled to interest, it is entitled to some method of updating the valuation of the land, which was over three years old by the time that the judgment was issued, and is over seven years old today. As discussed below, HS&G argues that the failure to update the valuation is unconstitutional.

¶ 31. We stress at the outset that we have no record to determine whether HS&G has suffered any injury from the valuation date of January 1, 2000. HS&G did not object to the net taking order that established that valuation date. Indeed, the superior court found in its order denying interest that HS&G agreed to that date. HS&G offered no evidence to suggest that the valuation would have been higher if the property were valued as of the date of trial. The court specifically instructed the jury that they were to value the property as of January 1, 2000, and HS&G did not object to that instruction. Thus, we reject this argument as addressed to us on appeal from the initial compensation judgment.

¶ 32. We recognize, however, that the absence of a record is an incomplete answer to HS&G's argument. The landowner is entitled to just compensation for the value of the condemned land at the time of the taking. *United States v. Reynolds*, 397 U.S. 14, 16 (1970). If the valuation date and actual date of taking are distant in time, the court-determined valuation may no longer suffice as just compensation. Thus, in comparable circumstances in *Kirby Forest*, the U.S. Supreme Court held that "when there is a substantial delay between the date of valuation and the date the judgment is paid, during which time the value of the land changes materially," 467 U.S. at 18, the Fifth Amendment principle of just compensation requires some procedure for updating the compensation award to reflect fair market value at the time of the taking. *Id.* at 17. The Court adopted the following procedure:

> Rule 60(b) empowers a federal court, upon motion of a party, to withdraw or amend a final order for "any . . . reason justifying relief from the operation of the judgment." This provision seems to us expansive enough to encompass a motion, by the owner of condemned land, to amend a condemnation award. The evidence adduced in

consideration of such a motion would be very limited. The parties would not be permitted to question the adjudicated value of the tract as of the date of its original valuation; they would be limited to the presentation of evidence and arguments on the issue of how the market value of the property altered between that date and the date on which the judgment was paid by the Government. So focused, the consideration of such a motion would be expeditious and relatively inexpensive for the parties involved. Further refinement of this procedural option we leave to the courts called upon to administer it.

*Id.* at 18-19.

¶ 33. The District urges us to adopt the *Kirby Forest* procedure and leave HS&G to a post-judgment motion under V.R.C.P. 60(b). In support of this approach, we note that V.R.C.P. 60 and F.R.C.P. 60 are substantially identical. Reporter's Notes to V.R.C.P. 60. We have frequently followed federal precedents in interpreting our civil rules. See, e.g., *Tetreault v. Tetreault*, 148 Vt. 448, 451, 535 A.2d 779, 781 (1987) (using federal decisions in interpreting V.R.C.P. 60(b)). The solid waste management district condemnation statute specifically states that the Vermont Rules of Civil Procedure apply to condemnation proceedings under the statute. 24 V.S.A. § 2299k. HS&G responds that the *Kirby Forest* procedure cannot be used in condemnation cases in Vermont because compensation here is determined by a jury, whereas compensation is determined by the court without a jury in the federal system. This response confuses the procedure for determining whether a constitutional violation has occurred with the remedy if a constitutional violation is demonstrated. Thus, we can follow the *Kirby Forest* procedure in two steps. In the first, the property owner must demonstrate to the court that grounds exist to grant relief from judgment under Rule 60(b)(6): that is, that there has been a material change in the value of the property between the date of the valuation and the date of the tender of compensation. Assuming that the court finds grounds for relief, the narrow question of the increase in value can be submitted to the jury. We adopt this procedure.

¶ 34. In adopting the *Kirby Forest* procedure, we note that the trial court can minimize the need for post-trial motions by valuing the property as of the date of trial, rather than an earlier date.

Indeed, to prevent a continuing cycle of post-judgment motions, any determination of increase in value under the *Kirby Forest* procedure must include the period up to the supplemental trial. We also note that the condemning authority can reduce the need for a supplemental determination of value by tendering payment to complete the taking as soon after the judgment as possible.

¶ 35. The District has raised three issues on cross-appeal, but waived these issues if we affirmed the judgment below. Since we have affirmed the superior court's judgment, we do not address the cross-appeal issues.

*Affirmed.*