# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Columbia Venture, LLC, Appellant,

v.

Richland County, Respondent.

Appellate Case No. 2013-001067

───────────────

Appeal from Richland County
John Hamilton Smith, Sr., Special Referee

───────────────

Opinion No. 27563
Heard November 18, 2014 – Filed August 12, 2015

───────────────

**AFFIRMED**

───────────────

Manton M. Grier, James Y. Becker, and Elizabeth Halligan Black, all of Haynsworth Sinkler Boyd, PA, of Columbia, for Appellant.

M. McMullen Taylor, of Mullen Taylor, LLC, of Columbia, Pope D. Johnson, III, of Johnson & Barnette, LLP, of Columbia, and John D. Echeverria, of South Royalton, Vermont, for Respondent.

John S. Nichols, of Bluestein Nichols Thompson and Delgado, of Columbia, for Amicus Curiae, The Association of State Floodplain Managers, Inc.; Robert E. Lyon, Jr., John K. DeLoache, Alexander White Smith and James Ferguson Knox, all of Columbia, for Amicus Curiae, South Carolina Association of Counties.

**JUSTICE KITTREDGE:** Appellant Columbia Venture, LLC, purchased 4,461 acres of land along the eastern bank of the Congaree River in Richland County, intending to develop the property. Columbia Venture knew at the time of the purchase that the Federal Emergency Management Agency (FEMA) was in the process of revising the area flood maps and designating most of the property as lying within a regulatory floodway. *See* 42 U.S.C. § 4101(e)–(f) (requiring FEMA to assess the need to revise flood maps every five years). Pursuant to federal law, development is generally not permitted in a regulatory floodway. When Columbia Venture's efforts to remove the floodway designation were unsuccessful, Columbia Venture sued Richland County, alleging an unconstitutional taking. By consent, the case was referred to a special referee, who after numerous hearings and a multi-week trial dismissed the case and entered judgment for Richland County. We affirm.

## I.

To reduce the losses caused by flood damage, to create a unified national program for floodplain management, and to increase the availability of affordable flood insurance, Congress enacted the National Flood Insurance Act of 1968, through which it established the National Flood Insurance Program (NFIP). 42 U.S.C. §§ 4001–4131. Under the NFIP, state and local governments must "make appropriate land use adjustments to constrict the development of land which is exposed to flood damage and minimize damage caused by flood losses," and "guide the development of proposed future construction, where practicable, away from locations which are threatened by flood hazards." *Id.* § 4001(e). Although local communities are not required to participate in the NFIP, no purchaser or owner of property located within a non-participating community is eligible for federal lending, flood insurance, or federal disaster relief. *See id.* §§ 4022(a), 4106. Richland County has participated in the NFIP since 1981.

FEMA is the federal agency responsible for implementing the NFIP and for making scientific and technical determinations to identify flood hazards for a given area. 42 U.S.C. § 4101(e)–(f). The basis for most of FEMA's mapping and regulation is the "base flood" or "100-year flood," which has a one percent chance of occurring in any particular year.[1] 44 C.F.R. § 59.1. Based on its scientific

---

[1] As a practical matter:

studies regarding the elevation of a base flood, FEMA issues a Flood Insurance Rate Map ("FIRM" or "flood map"), which identifies and delineates flood hazards within a community.[2] *Id.* Communities are required to adopt the FIRMs and to restrict development in those flood hazard areas.[3] 42 U.S.C. § 4102(c); 44 C.F.R. § 60.3. A local community's floodplain land-use controls must meet FEMA's minimum requirements, but FEMA encourages communities to impose more restrictive regulations. 44 C.F.R. § 60.1(d). In one important aspect, Richland County's regulations are more restrictive than the FEMA minimum in that Richland County, by ordinance, prohibits construction in a floodway.

Flood hazard areas are divided into two parts, called the "regulatory floodway" and the "flood fringe," which are referred to collectively as the "floodplain." In conducting its flood studies, FEMA identifies the area adjacent to a river or stream

---

> It is important to note that the 100-year storm is not based on any actual storm. Instead, a theoretical storm is constructed by using mathematical models. A hydraulic computer model is applied to generate the width and location of the floodway at each cross-section at which the stream is measured. The water surface elevation for the design flood is plotted onto a corresponding topographical map showing relative ground elevations. Areas in which the plotting reveals the flood elevation of the theoretical design flood to be higher than the ground elevation are then included within the flood hazard area.

*Am. Cyanamid Co. v. State, Dep't of Envtl. Prot.*, 555 A.2d 684, 688 (N.J. Super. Ct. App. Div. 1989) (internal citation omitted).

[2] Floodplain areas are continuously shaped by the forces of water, and surrounding development also alters the floodplain and the dynamics of flooding. Accordingly, FEMA must assess the need to revise its flood maps every five years and undertake revisions as it sees fit. 42 U.S.C. § 4101(e)–(f). FEMA may also initiate a re-study at any time upon the request of a state or local government if the requesting community supplies sufficient technical data justifying the request. *Id.*

[3] In addition to local land use restrictions, federal law requires flood insurance in special hazard areas. 44 C.F.R. § 59.1.

that is subject to dangerously high flood levels and rushing water during a flood and within which the presence of development would increase the danger posed by flood conditions. This area, which poses the greatest flood risk, is known as the regulatory floodway. 44 C.F.R. § 59.1. The remainder of the floodplain area is the flood fringe, which is expected to be under water during a 100-year flood but within which floodwaters are expected to be comparatively more shallow and slow-moving. Richland County is comprised of 487,600 acres of land, of which 16,516 acres are designated as regulatory floodways.

Within a regulatory floodway, FEMA requires that a community must, at a minimum:

> [P]rohibit encroachments, including fill, new construction, substantial improvements, and other development within the adopted regulatory floodway *unless it has been demonstrated* through hydrologic and hydraulic analyses performed in accordance with standard engineering practice *that the proposed encroachment would not result in any increase in flood levels* within the community during the occurrence of the base flood discharge.

44 C.F.R. § 60.3(d)(3) (emphasis added). This is commonly referred to as the "no-rise" standard.

As noted, Richland County's restrictions on encroachments within a regulatory floodway are more restrictive than the FEMA minimum.[4] Under the floodway

---

[4] Michael Criss, a former Richland County Planning Director, testified Richland County's more restrictive land-use standards enable County residents to receive discounted flood insurance rates and that these more-restrictive standards are forward-looking and thus further public safety because:

> The federal flood maps do not account for the continued urbanization and development of the corresponding watersheds and the resulting increase in stormwater runoff and potential flooding. . . . The federal flood maps are retrospective. They rely on historical flood records and don't project the potential of increased flooding in the future from urbanization or from the possibility of more intense storms due to climate change.

provision of the County's stormwater management ordinance in place when Columbia Venture purchased the property, "no levees, dikes, fill materials, structures or obstructions that will impede the free flow of water during times of flood will be permitted in the regulatory floodway." Richland County, S.C., Code § 8-62(h) (1994). This prohibition against impeding the free flow of floodwater, or the "no-impede" standard, essentially prohibits construction in a floodway.[5] By contrast, areas outside the regulatory floodway but still within the fringes of the floodplain may be developed, so long as new structures are sufficiently elevated and flood-proofed. *Id*. § 26-73.5(2) (1999). Thus, FEMA's determination of whether an area of land is within a regulatory floodway (versus within the larger floodplain) essentially determines whether development will be permitted.[6]

Once FEMA completes its scientific studies and prepares a revised flood map, the new maps are issued as preliminary documents for review by the affected community and the public. 42 U.S.C. § 4104(a). The revised flood maps do not become final until federal statutory notice and administrative appeal periods have passed.[7] However, under certain circumstances (that apply in this case), communities are directed to use the preliminary revised flood maps for the purposes of floodplain regulation. Specifically, federal guidance provides that if a preliminary revised flood map widens a floodway or shows higher base flood elevations than the current final flood map, then the preliminary revised map should be used for regulatory and permitting purposes.

---

[5] The following uses are permitted within a regulatory floodway: agricultural and horticultural uses, parking areas, accessory and recreational uses (such as lawns, gardens, play areas, swimming areas, fishing areas, beaches, boat ramps, parks, playgrounds, etc.), airport runways and landing strips, and various infrastructure uses (such as streets, bridges, overhead utility lines, storm drainage facilities, sewer lines, and waste treatment plants). Richland County, S.C., Code § 26-73.4(3).

[6] The County's stormwater management ordinance did not contain a variance provision.

[7] A community itself or any private citizen adversely affected by the proposed flood-map revisions may initiate an administrative appeal challenging the scientific or technical basis for FEMA's determinations. 42 U.S.C. §§ 4104–4104-1.

Aside from successfully appealing the scientific or technical basis for FEMA's floodplain designations, a floodplain designation may be removed if a landowner constructs a certified levee, thereby allowing the area protected by a certified levee to no longer be considered part of the floodway or floodplain. 44 C.F.R. § 65.10. For a levee to be certified, it must meet FEMA's design, stability, and orientation standards, and a local NFIP community must agree to assume responsibility for maintaining the levee. 44 C.F.R. § 65.10(c)–(d). Although FEMA regulations require that levees be designed to withstand a 100-year flood, Richland County's ordinances are stricter and require that levees must provide protection from a 500-year flood[8] plus three feet of freeboard. Richland County, S.C., Code § 8-62(g) (1994).

Prior to undertaking any levee upgrades necessary to acquire FEMA certification, property owners may submit proposed design and construction plans, along with supporting scientific data, for FEMA's review and advance comment as to whether such plans are sufficient to obtain levee certification. 44 C.F.R. § 65.5. The scientific data required for FEMA to consider a proposed project involves extensive hydraulic and hydrologic engineering analysis. *Id.* § 65.6. After a levee construction project is approved and completed, FEMA then revises its flood map to reflect the protection provided by the certified levee and removes the floodplain designation through a Letter of Map Revision (LOMR). *Id.* § 65.10

We turn now to the facts of this case.

## II.

This case involves 4,461 acres of land along the eastern bank of the Congaree River in Richland County. The property is located just a few miles from the City of Columbia, near Interstate 77, Heathwood Hall Episcopal School, and the City of Columbia's sewer treatment plant. For decades, the property was owned by the late Burwell Manning and was used for farming and recreational purposes.[9]

---

[8] A 500-year flood is one that has a 0.2% chance of occurring in any given year.

[9] The only structures on the property are barns, a grain facility, an unoccupied house, and an office building.

In order to protect the property from flooding, in the early 1960s, Manning constructed a system of levees extending for over twenty miles along the banks of the Congaree River and Gills Creek, which runs through the property. These agricultural levees were approximately twenty feet tall by forty-five feet wide and were constructed under the supervision of Manning and a registered surveyor using an Army Corps of Engineers' levee construction manual and guidance from the U.S. Department of Agriculture. At the time the levees were constructed, no permitting process or levee design and construction regulations existed. Although the immediate purpose of the levees was to protect his crops, Manning ultimately envisioned large-scale development on the property, and he knew that sufficient levees would be required to protect any future development.

Following completion of the levees, Manning sold approximately 120 acres to the City of Columbia for construction of its sewer treatment plant.[10] Thereafter, Manning subdivided and donated a parcel of land for the construction of Heathwood Hall Episcopal School. In addition to protecting Heathwood Hall, the City's sewer plant, and the remainder of Manning's property, the levees also protect the nearby land of several other property owners and another wastewater treatment plant.

Over the years, Manning used the property to secure various loans and agricultural credit lines, and by June 1997, Manning had defaulted on those loans. To maintain possession of his property (and to keep it from being subdivided, which would have thwarted his development vision), Manning entered into a complicated series of real estate transactions, through which his outstanding agricultural debts were paid and he retained an option to repurchase the property no later than February 1999. After securing the repurchase option in June 1997, Manning and his son Deas Manning, began looking for investors to help finance the planned repurchase before the option expired.

---

[10] The City's parcel included a portion of the levees along the Congaree River, and the deed included a covenant by the City to maintain the levees. In 1976, the City's portion of the levee failed due to a lack of proper maintenance and allowed water to flow onto an adjacent 1806-acre parcel still owned by Manning; Manning sued the City and recovered damages resulting from the City's failure to adequately maintain the levees. *See Manning v. City of Columbia*, 297 S.C. 451, 452, 377 S.E.2d 335, 336 (1989) (affirming a jury award of $4,120,000 in favor of Manning).

At that time, only the thin strip of land between the river channel and the riverside toe of the levees was designated as part of the regulatory floodway and subject to the County's extensive development restrictions.  Thus, in June 1997, the levees themselves could be improved and had the potential to become FEMA-certified, thereby allowing the land behind the levees to be developed.

By the spring of 1998, Tee-To-Green, LLC, expressed interest in developing the property into a golf course and entered into a joint venture option agreement with Manning.  During the contractual due-diligence period, Tee-To-Green ordered site plans, conducted environmental assessments and wetlands investigations, and commissioned an appraisal, which valued the property at $30 million; however, at some point during the due-diligence period, Tee-To-Green discovered FEMA was in the process of revising the flood map of Richland County and that the preliminary revised map was expected to reconfigure the regulatory floodway to include approximately 70% of the property.  Ultimately, Tee-To-Green withdrew its option to purchase the property, as it was unable to obtain satisfactory assurances from the County that the levees could be upgraded in light of the imminent floodway designation.  Tee-To-Green understood that the floodway designation thwarted its intended development and reduced the value of the property.

On June 5, 1998, FEMA released its preliminary revised flood map, and as anticipated, the revisions enlarged the Congaree River's regulatory floodway to encompass most of the property owned by Manning, the City of Columbia, and Heathwood Hall.  Although this revised map was not yet finalized, it was the effective map for permitting purposes, as it widened the regulatory floodway and showed higher base flood elevations than the prior map.

Since the levees were included within the regulatory floodway under the preliminary revised flood map, as of June 5, 1998, whether it was possible to obtain a land-disturbance permit to upgrade the levees depended on County's interpretation of the "no-impede" standard within its ordinance.  Although that ordinance has always expressly prohibited any encroachment that would "impede the free flow of water," there is some evidence that certain County employees, at some point, interpreted that language as being consistent with the less restrictive FEMA "no-rise" standard which permits development within a floodway, so long

as it is shown not to cause an increase in flood levels. This uncertainty in the meaning of the County's 1994 stormwater ordinance no-impede standard is central to Columbia Venture's theory of the case.[11]

With one potential sale already falling through over the unresolved flood-map issues and the expiration of the repurchase option quickly approaching, Manning was running out of time to find another investor. In mid-1998, another development company, Burroughs & Chapin, expressed interest in purchasing the property to construct a large-scale, mixed-use development. Burroughs & Chapin is based out of Horry County; it had never taken on a project of this large a scale outside Horry and Georgetown counties or any project involving levee systems or FEMA regulations. Burroughs & Chapin recognized that there was a "small window of opportunity to get this large amount of acreage, strategically located, in one parcel for development purposes [at] the right price." As early as May 1998, internal documents of Burroughs & Chapin reflect it was well-aware that the bulk of the property was designated as a regulatory floodway and that construction is not permitted in a floodway. Nevertheless, Burroughs & Chapin continued to pursue the possibility of purchasing the property, and on November 13, 1998, Burroughs & Chapin entered into a Purchase Agreement with Manning.

Before the sale was finalized, Burroughs & Chapin retained the Lockwood Greene engineering firm to assist it in exploring the FEMA floodway issues. Prior to closing, Lockwood Greene issued a cursory report purporting to summarize "the FEMA and floodway issues" and estimating a cost and completion date range for the potential levee construction. The report acknowledged the 1998 preliminary flood map designating most of the property as a floodway but stated "the acceptance of these maps as final is currently on hold by FEMA," and that the property's floodplain classification could be removed altogether through upgrading and obtaining FEMA certification of the levees.[12] The report also stated that the "floodway elevation is currently being re-done by FEMA," and that "[t]he results

---

[11] Columbia Venture did not seek an opinion from counsel concerning the proper interpretation or the impact of the stormwater ordinance on its proposed development prior to purchasing the property.

[12] This statement that the finalization of the 1998 map had been "put on hold" erroneously implied that that preliminary map was not the operative map for permitting purposes.

of this are not known as of yet."  This preliminary engineering report did not include any of the required scientific flood modeling or analysis and did not address the relevant levee design and construction requirements. Further, this cursory evaluation did not take into account Richland County's more stringent development restrictions or the cost implications of those enhanced requirements. At trial, Columbia Venture's engineer admitted that at the time of this preliminary report, "we didn't quite understand the full [FEMA] certification process."[13]

Seeking assurance that its development plans would come to fruition, Lockwood Greene, on behalf of Burroughs & Chapin, provided a summary of the intentions to upgrade the levees and sought assurance from FEMA that it would agree to certify the levees following construction and from Richland County that it would assume responsibility for levee maintenance following FEMA certification.

FEMA responded with a letter stating the following:

> If the aforementioned levee is upgraded to meet in total the applicable provisions of 44 C.F.R., Part 65.10, and the construction necessary for it to meet said requirement[s] is in compliance with State and local floodplain management requirements, then FEMA would revise the applicable FIRM to remove the Special Flood Hazard Area designation and floodway.  As you are aware, should the structural modifications necessary to bring the levee into compliance with 44 C.F.R., Part 65.10 result in any increase in base flood elevations as a result of construction within the existing regulatory floodway of the Congaree River, the requirements of 44 C.F.R., Part 65.12 would also have to be met.  In addition, any change in the configuration of the floodway as a result of the levee modifications will have to be done with the approval of the impacted communities.

Meanwhile, Lockwood Greene had also requested that Richland County agree to assume responsibility for the levees if FEMA agreed to certify them following construction.  However, because this request was presented to County Council

---

[13] The engineer also acknowledged that "we all didn't completely understand what the scope of the work was at that time," in order to challenge the scientific and technical basis of FEMA's floodway designations.  At the time of purchase, Columbia Venture was not prepared to submit the extensive engineering analysis required to obtain a LOMR from FEMA.

approximately two weeks before the scheduled closing date, the County was concerned that it did not have sufficient time to explore fully the financial and safety aspects of the proposed levee construction. As a result, County Council adopted the following contingent resolution regarding the levees:

> [T]o accept responsibility for local inspection and enforcement of the levee system, and if required by FEMA, to accept operation and maintenance responsibility for the system *contingent upon the following*:
>
> 1)      The property owners upgrade the levees to meet FEMA standards;
>
> 2)      [T]he property owners prepare all required documentation including operation and maintenance plans;
>
> 3)      [C]ertification that the levee system, as upgraded meets FEMA standards;
>
> 4)      The parties, including Richland County, the City of Columbia and the developers, resolve the issues of the performance and funding of the operation and maintenance responsibility;
>
> 5)      The county's acceptance of responsibility terminates if the developers of the area do not invest at least $30,000,000 within ten years of the date of the adoption of this motion.

(emphasis added).

Additionally, Burroughs & Chapin solicited a "Non-Binding Memorandum of Understanding" from the County Administrator, which stated, "[t]he County is aware of and agrees to work with the development group on issues that are critical to the proposed development such as zoning, tax incentive vehicles and a multi-county business park." The bottom of the memo reiterated, "This agreement is intended to be non-binding on the parties." This memorandum of understanding did not provide the outright assurances relating to government assumption of ongoing levee maintenance as required by 44 C.F.R. § 65.10.

Nevertheless, the board of directors of Burroughs & Chapin thereafter resolved to move forward with the purchase of the property based on its belief that "an agreement *can be negotiated* with Richland County to assume the maintenance of the dike system." (emphasis added). Indeed, the board of directors was well aware that the County's Resolution expressly involved multiple contingencies, and at trial, Columbia Venture conceded that the Resolution did not bind Richland County to accept maintenance of the levees.

Notably, in the days and weeks leading up to the sale, Burroughs & Chapin was having difficulty retaining investors in the joint venture to help fund the agreed-upon purchase price of $18 million. As the closing date neared, Burroughs & Chapin had acquired firm cash commitments of only $11 million. To cover the shortfall, Burroughs & Chapin negotiated with Manning to accept the $11 million and take the balance of the purchase price as shares in the joint venture. On February 17, 1999, Appellant Columbia Venture, LLC, was formed with its initial members including Burroughs & Chapin (contributing $9 million and serving as the managing member), Lockwood Greene (contributing $2 million in in-kind engineering services), and Manning's Green Diamond, LLC (receiving $6,650,000 in membership shares in Columbia Venture, which were to be redeemed within fourteen months).

Despite the unresolved status of the various FEMA flood map issues, on February 19, 1999, Columbia Venture proceeded with the transaction and purchased the property for a price of $18 million. Based on a then-recent appraisal, Columbia Venture believed that if its development plan proved unworkable, the property could still be sold for around $30 million.

As of the date of purchase, Columbia Venture knew FEMA's preliminary flood map designated almost all of the property as lying within the regulatory floodway, that the County's stormwater ordinance could be interpreted to preclude improvement of the levees and subsequent commercial development, and that the possibility of FEMA approving and certifying upgraded levees was contingent upon a host of factors which Columbia Venture had not fully explored and over which Columbia Venture did not exercise ultimate control.

Shortly after closing, Columbia Venture announced its plans for a $1 billion development on the property, which it called Green Diamond. The initial Green Diamond plans included residential uses, golf courses, an outlet mall, restaurants, hotels, offices, retail businesses, a research and development park, a retirement

village, a theme park, and a wildlife expo, all to be constructed within the Congaree River floodplain. This development plan was contingent upon Columbia Venture receiving $864 million in multi-county business park public financing incentives and $80 million in infrastructure costs to be financed through special revenue bonds issued by the County. Columbia Venture had not obtained any assurances as to these plans and was aware of the concerns raised by its requests of Richland County and the City of Columbia.[14]

On February 20, 2002, FEMA's revised floodway determinations, placing 3,130 acres of Columbia Venture's property within a regulatory floodway, became final by operation of law.[15] Columbia Venture appealed FEMA's findings in federal court but, ultimately, was unsuccessful.[16] Columbia Venture claims that the date of the alleged taking was February 20, 2002. Thus, it was FEMA's floodway determination that Columbia Venture claims constitutes the alleged taking—not any action by Richland County.

In August 2004, Columbia Venture filed suit, claiming the County's actions constituted an unconstitutional taking and a substantive due process violation. Following a lengthy stay pending the resolution of Columbia Venture's appeal of

---

[14] Moreover, in addition to government concerns, public opposition to the project began to mount, and a citizen group called the Congaree Task Force opposed the project.

[15] The remaining 1,135 acres of Columbia Venture's property were outside of the floodway.

[16] In its federal appeal, Columbia Venture disputed the scientific and technical basis for FEMA's September 2000 base flood elevation determinations, which caused most of Columbia Venture's land to be designated as lying within the regulatory floodway. *Columbia Venture LLC v. S.C. Wildlife Fed'n*, 562 F.3d 290, 294 (4th Cir. 2009). The federal district court vacated FEMA's determinations based on FEMA's failure to strictly comply with the timing of required notice publications. *Id.* FEMA appealed, and the Fourth Circuit reversed the district court and reinstated FEMA's base flood determinations, finding FEMA's noncompliance was harmless and Columbia Venture was not prejudiced by FEMA's failure to publish notifications, as Columbia Venture was deeply involved in the administrative process from the beginning. *Id.* at 294–95.

the federal court action, this action resumed in December 2010, and was referred to retired circuit court judge John Hamilton Smith as Special Referee. In various pre-trial rulings, the Special Referee granted summary judgment in favor of the County as to Columbia Venture's per se taking claim and substantive due process claim, but denied summary judgment on Columbia Venture's regulatory taking claim.

Thereafter, Columbia Venture's regulatory taking claim was tried before the Special Referee, sitting without a jury. Following the multi-week trial, the Special Referee found that Richland County's actions did not constitute a taking.[17] Specifically, in terms of the *Penn Central*[18] factors, the Special Referee found the designation of Columbia Venture's property as a regulatory floodway (by FEMA, not Richland County) caused a significant decrease in the property's value; however, the Special Referee concluded that factor was outweighed by the fact that Columbia Venture's investment-backed expectations were not reasonable in light of the inherent risk in floodplain development. Moreover, the Special Referee found the County's pre-existing floodplain regulations and floodplain management regulations served an important purpose of flood protection. The Special Referee concluded that, on balance, the *Penn Central* factors preponderated against a taking and therefore that the County could not be responsible for any diminution in the property's value. This appeal followed.

## III.

Having set forth in detail the factual background and procedural history associated with Columbia Venture's purchase of the property and many efforts to remove the floodway designation, we address the merits of this appeal. Like the able Special Referee, we find Richland County's adoption of floodway development restrictions and the County's required utilization of FEMA flood data do not constitute a taking of any sort.

"The question of a taking is one of law." *Ex Parte Brown*, 393 S.C. 214, 224, 711 S.E.2d 899, 904 (2011). However, "[w]hether a taking that is compensable under the Fifth Amendment has occurred is a question of law that is based on factual determinations." *Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1365

---

[17] We commend the learned Special Referee for his expert handling of this case, including his thorough and excellent order.

[18] *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978).

(Fed. Cir. 2004) (citations omitted). "In an action at law, on appeal of a case tried without a jury, the findings of fact of the judge will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's findings." *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976). "The judge's findings are equivalent to a jury's findings in a law action." *Id.* (citing *Chapman v. Allstate Ins. Co.*, 263 S.C. 565, 567, 11 S.E.2d 876, 877 (1974)). The evidence compellingly supports the findings of the Special Referee.

## A. Flowage Easement

Columbia Venture argues the County's adoption of the revised FEMA flood maps (which designate most of Columbia Venture's property as lying within the regulatory floodway and trigger development restrictions that prevent Columbia Venture from expanding the levees) is tantamount to the County taking a flowage easement upon Columbia Venture's property for which it is entitled to just compensation under the Takings Clause. We disagree, for the Special Referee properly found Richland County's floodway development restrictions are simply limitations on land use and do not constitute a flowage easement upon Columbia Venture's property.

We acknowledge the well-established principle that government-induced flooding may, in some circumstances, constitute a taking that would justify compensation under the Takings Clause. *See Arkansas Game & Fish Comm'n v. United States*, 133 S.Ct. 511, 518 (2012) ("'[W]here real estate is actually invaded by superinduced additions of water, earth, sand, or other material . . . so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution.'") (quoting *Pumpelly v. Green Bay Co.*, 80 U.S. 166, 181 (1871)). However, for flooding to amount to a taking, there must be a causal connection between the challenged government act and the increased flooding—a connection which is lacking in this case. *See Sanguinetti v. United States*, 264 U.S. 146, 149–50 (1924) (finding no taking occurred where there was no causal connection between the construction of a nearby government canal and the increased amount or severity of periodic flooding).

In addition to the requirement of a causal connection, a compensable taking occurs only where a claimant shows an actual increase in the frequency or severity of flooding. *See Danforth v. United States*, 308 U.S. 271, 285 (1939) (rejecting the argument that the passage of legislation in and of itself constitutes a taking and

noting that although "[a] reduction or increase in the value of property may occur by reason of legislation . . . [s]uch changes in value are incidents of ownership" and "cannot be considered as a 'taking' in the constitutional sense"); *see also Stueve Bros. Farms, LLC v. United States*, 737 F.3d 750, 753 (Fed. Cir. 2013) ("[U]nder well-settled law, the apprehension of flooding does not constitute a taking of a flowage easement."). Indeed, to successfully show the government has taken a flowage easement, a claimant must demonstrate that the occurrence of flooding is the "natural consequence of government action" and that such flooding, though it may be intermittent, is nevertheless "of a type which will be inevitably recurring." *Barnes v. United States*, 538 F.2d 865, 870–73 (Ct. Cl. 1976) (finding claimant had shown a government taking of a flowage easement by demonstrating significant damages resulting from frequent and inevitably recurring flooding which was the natural consequence of the government's control of the flow of a river through a nearby dam).

In evaluating this claim, we find the United States Supreme Court's decision in *United States v. Sponenbarger*, 308 U.S. 256 (1939), instructive. Following "the most disastrous of all recorded floods" which occurred along the Mississippi River in the spring of 1927, Congress enacted the Mississippi Flood Control Act of 1928 (the "1928 Act") which provided for extensive improvements to a 950-mile system of levees along both banks of the Mississippi River stretching from Missouri to the Gulf of Mexico. *Id.* at 261. The improved levee system was designed to include several designated spillway points, at which the height of the existing levees would not be raised and behind which diversion channels would be constructed. These lower spillway points were created to divert floodwaters from the main river channel in an effort to prevent floods from cresting over the higher riverside levees during major flood events. Thereafter, Julia Sponenbarger, an owner of land lying in a contemplated diversion channel along the waterway, filed suit against the United States alleging the 1928 Act would result in her property being inundated with water during major floods, for which she was entitled compensation under the Takings Clause. Although the existing levees protecting her land would not be altered or reduced under the 1928 Act, Sponenbarger nevertheless claimed a taking had occurred because the government planned to improve other nearby levees but not those protecting her land.

The Supreme Court held the 1928 Act did not constitute a taking of Sponenbarger's property or a "servitude from excessive floodwaters" because the United States had neither caused her property to flood nor "in any wise nor to any extent increased

the flood hazard thereto." *Id*. at 263 (internal marks omitted). Since the existing levees were to remain in place, the Supreme Court found:

> [T]he 1928 Act had not increased the immemorial danger of unpredictable major floods to which [Sponenbarger]'s land had always been subject. Therefore, to hold the Government responsible for such floods would be to say that the Fifth Amendment requires the Government to pay a landowner for damages which may result from conjectural major floods, even though the same floods and the same damages would occur had the Government undertaken no [action] of any kind. So to hold would far exceed even the "extremest" conception of a "taking" by flooding within the meaning of that Amendment. For the Government would thereby be required to compensate a private party owner for flood damages which it in no way caused.

*Id*. at 265.

The Supreme Court readily acknowledged that a taking may occur where the government directly subjects private land to intermittent floods; however, as to Sponenbarger's property, the Court held "[t]he Government has not subjected [her] land to any additional flooding, above what would occur if the Government had not acted; and the [Takings Clause of the] Fifth Amendment does not make the Government an insurer that the evil of floods be stamped out universally." *Id*. at 266.

Here, as in *Sponenbarger*, the existing levees have remained in place, and unlike other cases in which the natural consequence of government action caused an increase in flooding, here, the County's actions in adopting FEMA's revised flood maps do not, in any way, increase the flood hazard to which Columbia Venture's property has historically been exposed. *Compare Jacobs v. United States*, 290 U.S. 13, 16 (1933) (finding a compensable flowage easement was created by reason of the government's construction of a dam along a tributary of the Tennessee River, which caused an increase in the frequency of intermittent overflows upon claimant's farmland, destroyed claimant's crops, and impaired his use of the land for agricultural purposes), *and Cotton Land Co. v. United States*, 75 F. Supp. 232, 233–35 (Ct. Cl. 1948) (finding compensable taking occurred where the construction of a dam and the impounding of water in its reservoir caused over 7,000 acres of claimant's land to be flooded), *and Barnes*, 538 F.2d at 870–73

(finding claimant demonstrated the government had taken a flowage easement where claimant proved significant damages resulting from frequent and inevitably recurring flooding that was the natural consequence of the government's control of the flow of a river through a nearby dam), *with Danforth v. United States*, 308 U.S. 271, 286 (1939) (finding no taking occurred where riverbank levee was not lowered from its previous height and the land at issue was "as well protected from destructive floods as [it was] formerly" and stating "[t]he Government could become liable for a taking, in whole or in part, even without direct appropriation, [only] by such [action] as would put upon this land a burden, actually experienced, of caring for floods greater than it bore prior"), *and Sanguinetti* 264 U.S. at 149–50 (finding no taking occurred despite periodic flooding of claimant's property because the land was subject to the same periodic overflows prior to the government's construction of a nearby canal and levee system and claimant produced no evidence that the amount or severity of flooding was increased by construction of the canal). Indeed, the County's ordinances, which allow for maintenance and repair but prohibit expansion of the existing levees, merely maintain the status quo in terms of the flood risk. Thus, in the absence of any increase in flooding attributable to an act of the County, we affirm the Special Referee's finding that the County did not take a flowage easement.[19]

_____

[19] To the extent Appellant argues an exaction has occurred, we would likewise find this theory unavailing. This case in no manner falls within the exactions line of cases, as Richland County has not required Columbia Venture to grant an easement or dedicate a portion of its property for public use. *See Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994) (finding conditions on development of property constitute a taking if there is not a nexus between the legitimate state interest and the condition created or if the burden created by the condition is not "roughly proportionate" to the government's justification for regulating) (citing *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 837 (1987)).

Further, to the extent Columbia Venture argues the County's development restrictions amount to a categorical taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992) (finding a taking occurs where a regulation denies all economically beneficial or productive use of land), we likewise find this theory provides no relief because approximately thirty percent of Columbia Venture's property is not designated as lying within the regulatory floodway and therefore is not subject to the same stringent development restrictions. Moreover, the entire tract retained substantial value for agricultural and other purposes, even under the existing designations. Indeed, since February 2002, Columbia Venture

## B. Regulatory Taking

In *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104 (1978), the United States Supreme Court "identified three factors to be weighed in order to determine whether a regulatory imposition could constitute a taking under the Fifth Amendment, thus requiring compensation on the part of the government for the taking of private property." *Norman v. United States*, 63 Fed. Cl. 231, 261 (2004). "In this analysis, the court must balance (1) the extent to which the regulation has interfered with the property owner's reasonable investment-backed expectations; (2) the economic impact of the regulation on the claimant; and (3) the character of the governmental action at issue." *Id.* (citing *Penn Central*, 438 U.S. at 124). Here, Columbia Venture argues that the Special Referee erred in finding no regulatory taking occurred because the *Penn Central* factors did not preponderate in Columbia Venture's favor. We disagree.

Aside from cases involving a *Lucas*-type categorical taking, "regulatory takings challenges are governed by the standards set forth in *Penn Central*." *Lingle v. Chevron U.S.A., Inc.,* 544 U.S. 528, 539 (2005); *see also Byrd v. City of Hartsville,* 365 S.C. 650, 658, 620 S.E.2d 76, 80 (2005) (finding that an inverse condemnation claim involving denial of less than all economically viable use is governed by *Penn Central* ). "The 'common touchstone' of each regulatory taking theory is 'to identify *regulatory actions that are functionally equivalent to the classic taking* in which government directly appropriates private property or ousts the owner from his domain.'" *Dunes West*, 401 S.C. at 314, 737 S.E.2d at 619 (quoting *Lingle,* 544 U.S. at 539, 125 S.Ct. 2074 (emphasis added)). "However, the United States Supreme Court repeatedly has declined to identify a specific threshold of interference with property rights below which no taking occurs and above which there is a taking." *Id.* at 314–15 (citing *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 535 U.S. 302, 332–35 (2002) (holding that determining whether a regulatory taking has occurred is not best served by

---

has sold approximately 3,000 acres of the property for almost $10 million. Thus, no regulation has deprived the property of all economically beneficial use, and no *Lucas*-type categorical taking occurred. *See Dunes West Golf Club, LLC v. Town of Mount Pleasant*, 401 S.C. 280, 313–14, 737 S.E.2d 601, 619 (2013) (finding that except in the extraordinary circumstance when no productive or economically beneficial use of land is permitted, no taking has occurred) (citing *Lucas*, 505 U.S. at 1015–16).

categorical rules but rather "requires careful examination and weighing of all the relevant circumstances")).

The Supreme Court has recognized "that no magic formula enables a court to judge, in every case, whether a given government interference with property is a taking." *Arkansas Game & Fish Comm'n*, 133 S. Ct. at 518. "In view of the nearly infinite variety of ways in which government actions or regulations can affect property interests, the [Supreme] Court has recognized few invariable rules in this area." *Id*. "Noting that these constitutional challenges present 'essentially ad hoc' inquiries which are largely dependent on the particular circumstances of each case, *Penn Central* identifies the appropriate factors to consider in determining whether a taking has occurred: the character of the government action, the economic impact of the regulation on the claimant, and the extent to which the regulation has interfered with distinct investment-backed expectations." *Dunes West*, 401 S.C. at 315, 737 S.E.2d at 619–20 (quoting *Penn Central*, 438 U.S. at 124).

In evaluating the *Penn Central* factors vis-à-vis Columbia Venture's property, the Special Referee noted that the property was historically, and still may be, used for agricultural and recreational purposes, even with the regulatory floodway designation. However, the Special Referee nevertheless found the regulatory floodway designation significantly impaired the fair market value of the property since mixed-use development, the highest and best use of the property, would not be possible. The Special Referee found this was the only *Penn Central* factor that preponderated in Columbia Venture's favor, and that on balance, this factor was far outweighed by the other two—namely, the unreasonableness of Columbia Venture's development expectations and the important, safety-enhancing character of the government action. Columbia Venture contends this was error. We disagree and address each in turn.

*1. Investment-Backed Expectations*

Columbia Venture urges this Court to reverse the Special Referee's findings, claiming its Green Diamond development plans were reasonable and achievable and that the County "induced" its development expectations by adopting the contingent resolution regarding levee maintenance and executing the non-binding memorandum of understanding regarding the same prior to purchase. We find the Special Referee did not err in concluding Columbia Venture's expectations were unreasonable.

In evaluating a regulatory taking claim, "[t]he purpose of consideration of plaintiffs' investment-backed expectations is to limit recoveries to property owners who can demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Cienega Gardens v. United States*, 331 F.3d 1319, 1345–46 (Fed. Cir. 2003) (quotations and citations omitted). "A property owner's reasonable investment-backed expectations are defined at the time the property is purchased." *Norman v. United States*, 63 Fed. Cl. 231, 267 (2004) (citation omitted).

In examining a party's investment-backed expectations, "'the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations.'" *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1348 (Fed. Cir. 2004) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 633 (2001) (O'Connor, J., concurring)). In examining the reasonable expectations prong, the level of industry regulation is a "pertinent but not determinative factor." *Chancellor Manor v. United States*, 331 F.3d 891, 906 (Fed. Cir. 2003). "The subjective expectations of the [claimant] are irrelevant." *Id.* at 904 (citation omitted). "The critical question is what a reasonable owner in the [claimant's] position should have anticipated." *Id.*

As for the regulatory scheme at issue here, the NFIP was enacted in 1968, and the County has been a participant since 1981—well before Columbia Venture purchased the property. Based on the evidence presented at trial, there is no doubt that Burroughs & Chapin, Columbia Venture's managing member, was a sophisticated real estate development company with actual and constructive notice of the County's floodplain development restrictions that essentially prohibited construction within a regulatory floodway. Moreover, at the time of the purchase, Columbia Venture was well aware of the revised FEMA flood map's floodway designation and the fact that such designation carried with it extensive regulatory implications affecting over seventy percent of the property.

Although Columbia Venture may have subjectively believed that, in spite of all this, it would nevertheless be allowed to develop the extensive Green Diamond project, we find any such expectation was not objectively reasonable. As the Special Referee found:

> [P]rior to purchase, Columbia Venture had made very little investment in actual engineering analysis of its levee. Columbia Venture did not know if it could convince FEMA to issue a Flood Map with no

floodway. Columbia Venture did not know whether it could upgrade its levee to meet FEMA's levee certification requirements. It did not know whether Richland County would ultimately accept responsibility for maintenance. It did not even have the financial resources in hand to undertake levee construction; in fact, Columbia Venture expected this cost to be paid through public financing.

. . . .

Columbia Venture faced an uncertain path forward with very little technical data and a complex regulatory scheme. Even Burroughs & Chapin's Board of Directors admitted that Green Diamond was "purely speculative in nature." This complex array of moving parts, all of which needed to fall into place in order for Columbia Venture to be able to develop its Property to the extent that it hoped for, made Columbia Venture's investment backed expectations unreasonable.

There is ample evidence in the record to support the Special Referee's factual findings, and we find the Special Referee did not err in determining this factor of the *Penn Central* analysis weighs against a taking. *See Mehaffy v. United States*, 499 F. App'x 18, 22 (Fed. Cir. 2012) (holding that recovery under a takings analysis is limited to property owners who can demonstrate reliance on a regulatory scheme that would allow their development plans to proceed unhindered); *Paradissiotis v. United States*, 304 F.3d 1271, 1276 (Fed. Cir. 2002) (finding that when a party moves forward with a transaction in light of actual or constructive knowledge of changing regulatory circumstances, "[t]he fact that his risk-taking turned out badly for him does not render it a taking in violation of the Fifth Amendment").[20]

---

[20] To be clear, we do not find the fact that Columbia Venture was on notice of the impending floodway designation prior to its purchase of the property to be dispositive of the takings claim; indeed, such a finding would be inconsistent with the United States Supreme Court's decision in *Palazzolo v. Rhode Island*, in which the Supreme Court reversed the state supreme court's finding that "the acquisition of title after the effective date of the regulations barred the takings claims." 533 U.S. 606, 631 (2001). However, by the same token, *Palazzolo* does not require this Court to ignore the timing or sequence of the claimant's notice of the regulatory imposition relative to the purchase of the property in evaluating the reasonableness of investment-backed expectations. To the contrary, timing and

*2. Character of the Governmental Action*

Columbia Venture argues the Special Referee erred in failing to find this prong preponderates in its favor and contends it alone bears a disproportionate burden of the County's flood map designations and that it receives no reciprocity of advantage by virtue of the regulation. We disagree, and find this factor likewise lends Columbia Venture no support.

The "character of the Government action" prong of the *Penn Central* analysis examines "the *magnitude or character of the burden* a particular regulation imposes upon private property rights" and "how any regulatory burden is *distributed* among property owners." *Lingle*, 544 U.S. at 542. In evaluating the benefits and burdens of a government regulation, "a taking does not take place if the prohibition applies over a broad cross section of land and thereby 'secure[s] an average reciprocity of advantage.'" *Penn Central*, 438 U.S. at 147 (quoting *Mahon*, 260 U.S. at 415) (noting that the concept of "reciprocity of advantage" is the reason zoning does not constitute a taking and stating "[w]hile zoning at times reduces individual property values, the burden is shared relatively evenly and it is reasonable to conclude that on the whole an individual who is harmed by one aspect of the zoning will be benefitted by another"). Indeed, the Fifth Amendment "'prevents the public from loading upon one individual more than his just share of the burdens of government'" and provides that only when an individual "'surrenders to the public something more and different from that which is exacted from other members of the public, [shall] a full and just equivalent [] be returned to him.'" *Id.* at 417–18 (quoting *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 325 (1893)).

Considering the character of the County's floodplain development restrictions, we find the important public purposes of mitigating the social and economic costs of flooding that are served by the County's ordinances are substantial and legitimate. *See Dolan*, 512 U.S. at 387 (acknowledging that floodplain development restrictions further legitimate public purposes of mitigating the serious risks posed by flooding). Moreover, the County's regulations further the important federal

---

sequence are quite probative and material to our analysis; we note they are simply not dispositive. *See id.* at 633 (noting "the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations") (O'Connor, J., concurring).

purposes served by the NFIP, namely to reduce the losses caused by flood damage, to create a unified national program for floodplain management, and to increase the availability of affordable flood insurance for all County residents. *See* 42 U.S.C. § 4001 (setting forth Congressional findings and declaration of purpose for the NFIP).

Columbia Venture's contention that it alone bears the burden of the County's ordinance is without merit. Indeed, the ordinance is applicable to all property located within a floodplain, which encompasses over 16,500 acres throughout the County. Richland County, S.C., Code § 8-18 (2001). This provision does not unjustly burden Columbia Venture. *See Penn Central*, 438 U.S. at 147 ("[A] taking does not take place if the prohibition applies over a broad cross section of land and thereby 'secure[s] an average reciprocity of advantage.'" (quoting *Mahon*, 260 U.S. at 415))).

Moreover, in terms of reciprocity of advantage, the County's restriction of floodway development benefits all owners of floodplain property within the County by reducing general flood hazards and allowing access to flood insurance under the NFIP. *See* 42 U.S.C. § 4022(a) (providing flood insurance coverage is available only in areas where governing bodies have adopted adequate land use and control measures); *Sponenbarger*, 308 U.S. at 267 (noting that where enforcement of a broad flood control program "measured in its entirety greatly reduces the general flood hazards," such a program is "highly beneficial" to individual tracts of land and does not involve a taking). Further, the County's limitations on development in flood-prone areas reduce the inherent risk of flood-related property damage and benefit all County taxpayers and residents by reducing the County's potential liability incurred in emergency response, rescue, evacuation, and other actions taken during a flood. *See, e.g.*, Roger A. Pielke, Jr., et al., *Flood Damage in the United States, 1926–2003: A Reanalysis of National Weather Service Estimates* 55 (National Oceanic & Atmospheric Administration, June 2002) (estimating that between 1929 and 2003, urban floods in the United States caused approximately $171 billion in property damage and noting the need for effective development management to mitigate future flood hazards as "[e]conomic damage results from an interaction between flood waters and human activities in the flooded area").

We find there is considerable evidence in support of the Special Referee's finding that this prong of the *Penn Central* analysis preponderates in favor of the County. Indeed, in light of the potential public costs of extensive development in the

regulatory floodway, we reject the argument that the County's floodway development restrictions constitute anything but responsible land-use policy. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2595 (2013) ("Insisting that landowners internalize the negative externalities of their conduct is a hallmark of responsible land-use policy, and we have long sustained such regulations against constitutional attack." (citing *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365 (1926))).

We conclude the Special Referee correctly determined that Columbia Venture's lack of reasonable investment-backed expectations coupled with the legitimate and substantial health and safety-related bases for the County's floodplain development restrictions outweigh Columbia Venture's economic injury, and under *Penn Central*, no regulatory taking occurred. *See Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352 (Fed. Cir. 2001) (rejecting a regulatory taking claim where the challenged government action aimed at preventing possible contamination into a water supply caused a substantial diminution in the value of certain mining leases and stating "[t]he exercise of the police power to address that kind of general public welfare concern is the type of governmental action that has typically been regarded as not requiring compensation for the burdens it imposes on private parties who are affected by the regulations").

## IV.

In sum, we find no taking occurred. Richland County is not the "'involuntary guarantor of the property owner's gamble that he could develop the land as he wished despite the existing regulatory structure.'" *Mehaffy v. United States*, 102 Fed. Cl. 755, 765 (2012) (quoting *Forest Props., Inc. v. United States,* 39 Fed.Cl. 56, 76–77 (1997)). "Purchasing and developing real estate carries with it certain financial risks, and it is not the government's duty to underwrite this risk as an extension of obligations under the takings clause." *Taub v. City of Deer Park*, 882 S.W.2d 824, 826 (Tex. 1994). Because no taking occurred, the decision of the Special Referee is affirmed.

**AFFIRMED.**

**TOAL, C.J., PLEICONES, BEATTY and HEARN, JJ., concur.**